# 25-1000-cv

## United States Court of Appeals

### for the

## Second Circuit

TOWN OF HEMPSTEAD,

*Plaintiff-Appellant,*

– v. –

UNITED STATES OF AMERICA, DEPARTMENT OF THE NAVY,
NORTHROP GRUMMAN CORPORATION, NORTHROP GRUMMAN
SYSTEMS CORPORATION, COVESTRO LLC, BAYER CORPORATION,
OCCIDENTAL CHEMICAL CORPORATION,

*Defendants-Appellees,*

THE KASPER (1977) IRREVOCABLE TRUSTS FOR THE
BENEFIT OF CHARLES B. KASPER AND RICHARD J. KASPER,
SANDERINA R. KASPER, as Trustee of the Kasper (1977) Irrevocable Trusts
for the Benefit of Charles B. Kasper and Richard J. Kasper, MARTIN STALLER,
PARVIZ NEZAMI, JEROME COGAN, LAWRENCE COHEN,
AMERICAN DRIVE-IN CLEANERS OF BETHPAGE, INC.,

*Defendants.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK (CENTRAL ISLIP)

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFF-APPELLANT

SCOTT B. FISHER
JASPAN SCHLESINGER NARENDRAN LLP
*Attorneys for Plaintiff-Appellant*
300 Garden City Plaza, 5th Floor
Garden City, New York 11530
(516) 746-8000

CP COUNSEL PRESS    (800) 4-APPEAL • (382565)

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... iii

PRELIMINARY STATEMENT ............................................................................1

JURISDICTIONAL STATEMENT .......................................................................2

ISSUES PRESENTED............................................................................................2

STATEMENT OF THE CASE...............................................................................3

    A.      Relevant Statutory Background ............................................................3

    B.      Summary Factual Background ..............................................................3

          1.     The Sites..................................................................................4

          2.     The Wells .................................................................................6

    C.      PROCEDURAL HISTORY ...................................................................10

STANDARD OF REVIEW ..................................................................................11

SUMMARY OF ARGUMENT ...........................................................................12

ARGUMENT ......................................................................................................14

    POINT I

    THE DISTRICT COURT ADOPTED A CAUSATION
    STANDARD INCONSISTENT WITH SECTION 107(a) OF
    CERCLA................................................................................................14

    POINT II

    THE TOWN ESTABLISHED THAT DEFENDANTS' RELEASE
    OF HAZARDOUS SUBSTANCES AT THE SITES CAUSED
    THE TOWN TO INCUR RESPONSE COSTS ...........................................20

    A.      Releases of Hazardous Substances at the Sites .................................21

          1.     The NG Site and the NWIRP Site ...........................................21

          2.     The Hooker/Ruco Site...............................................................24

    B.      Plausible Pathway of Migration to the Wells....................................29

i

1. Groundwater Flow ....................................................................29

2. Groundwater Modeling in the PWSCP.....................................32

3. New York State Source Water Assessment Plan
   ("SWAP") ................................................................................33

4. Freon-113 Groundwater Plume.................................................34

5. On-Site Containment System....................................................38

6. Freon-113 and TCE as Groundwater Contaminants.................39

7. Capture Zone Analysis of the Wells ........................................42

8. Plausible Migration Pathway from the Hooker/Ruco
   Site.............................................................................................42

9. Other Potential Sources of Contamination ..............................45

POINT III

THE TOWN'S RESPONSE COSTS WERE NECESSARY AND
CONSISTENT WITH THE NATIONAL CONTINGENCY PLAN ...........49

POINT IV

THE DISTRICT COURT ABUSED ITS DISCRETION IN
EXERCISING SUPPLEMENTAL JURISDICTION AND
DISMISSING THE STATE-LAW CLAIMS WITH PREJUDICE..............58

CONCLUSION ...................................................................................62

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*235 Metro Park Assocs. v. T.H. Green Elec. Co.*,
  2007 U.S. Dist. LEXIS 106477 (W.D.N.Y. 2007).............................45

*ABB Indus. Sys. v. Prime Tech.*,
  120 F.3d 351 (2d Cir. 1997).............................60

*AmBase Corp. v. 111 West 57th Sponsor LLC*,
  785 Fed. App'x. 886 (2d Cir. 2019).............................59

*Artesian Water Co. v. Gov't of New Castle Cty.*,
  659 F. Supp. 1269 (D. Del. 1987), *aff'd* 851 F.2d 643 (3d Cir. 1988) ...15, 37, 46

*Asarco LLC v. Cemex, Inc.*,
  21 F. Supp.3d 784 (W.D. Tex., El Paso Div. 2014) .............................19

*B.F. Goodrich Co. v. Murtha*,
  958 F.2d 1192 (2d Cir. 1992) .............................3

*B.F. Goodrich v. Betkoski*,
  99 F.3d 505 (2d Cir. 1996), *overruled on other grounds by New York v.
  Nat'l Servs. Indus., Inc.*, 352 F.3d 682 (2d Cir. 2003).............................24

*Benoit v. Saint-Gobain Performances Plastics Corp.*,
  959 F.3d 491 (2d Cir. 2020).............................60, 61

*Butler v. Raytel Med. Corp.*,
  150 Fed. App'x. 44 (2d Cir. 2005).............................39

*Cadillac Fairview v. Dow Chem. Co.*,
  840 F.2d 691 (9th Cir. 1988).............................55

*Cal. Inst. of Tech. v. City of Pasadena*,
  2024 U.S. Dist. LEXIS 153082 (C.D. Ca. August 23, 2024).............................19

*California Dep't of Toxic Substances Control v. NL Indus., Inc.*,
  636 F. Supp.3d 1092 (C.D. Ca. 2022) .............................19

*Castaic Lake Water Agency v. Whittaker Corp.*,
  272 F. Supp.2d 1053 (C.D. Ca. 2003) .............................18, 19

*Dedham Water Co. v. Cumberland Farms Dairy, Inc.*,
  889 F.2d 1146 (1st Cir. 1989) .............................16

iii

*DVL, Inc. v. GE Co.*,
  811 F. Supp.2d 579 (N.D.N.Y. 2010), *aff'd*, *DVL, Inc. v. Niagara
  Mohawk Power Corp.*, 490 Fed. App'x. 378 (2d Cir. 2012) ...............................29

*E*Trade Fin .Corp. v. Deutsche Bank AG*,
  2008 U.S. Dist. LEXIS 46451 (S.D.N.Y. June 13, 2008)...................................35

*Fetter v. DeCamp*,
  195 A.D.2d 771 (3d Dep't 1993) ....................................................................61

*Hempstead v. United States*,
  2017 U.S. Dist. LEXIS 237849 (E.D.N.Y Sept. 18, 2017) ...............................55

*Hopkins v. AMTRAK*,
  2015 U.S. Dist. LEXIS 196952 (E.D.N.Y. Aug. 20, 2015) ...............................35

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,
  725 F.3d 65 (2d Cir. 2013) ..............................................................................7

*Keywell Corp. v. Weinstein*,
  33 F.3d 159 (2d Cir. 1994) ..................................................................... 11-12

*Kolari v. New York Presbyterian Hosp.*,
  455 F.3d 118 (2d Cir. 2006) ..............................................................12, 59, 60

*Langman Fabrics v. Graff Californiawear*,
  160 F.3d 106 (2d Cir. 1998), *amended on other grounds by*
  169 F.3d 782 (2d Cir. 1998)............................................................................39

*MPM Silicones, LLC v. Union Carbide Corp.*,
  966 F.3d 200 (2d Cir. 2020) ............................................................................49

*New York v. Adamowicz*,
  16 F. Supp.3d 123 (E.D.N.Y. 2014), *aff'd* 609 Fed. App'x 19
  (2d Cir. 2015)..................................................................................................15

*New York v. Next Millennium Realty, LLC*,
  732 F.3d 117 (2d Cir. 2013) .....................................................................*passim*

*New York v. Shore Realty Corp.*,
  759 F.2d 1032 (2d Cir. 1985)..............................................................15, 16, 18

*Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*,
  596 F.3d 112 (2d Cir. 2010) .....................................................................*passim*

*Palazzo v. Corio*,
  232 F.3d 38 (2d Cir. 2000)..............................................................................39

*Perma Research & Dev. Co. v. Singer Co.*,
  410 F.2d 572 (2d Cir. 1969) ..............................................................39, 41

*Price Trucking Corp. v. Norampac Indus.*,
  748 F.3d 75 (2d Cir. 2014) ......................................................................11

*Revitalizing Auto Cmtys. Envtl. Response Trust v. Nat'l Grid USA*,
  10 F.4th 87 (2d Cir. 2021) ........................................................................57

*SCR Joint Venture L.P. v. Warshawsky*,
  559 F.3d 133 (2d Cir. 2009) .....................................................................12

*Scribner v. Summers*,
  84 F.3d 554 (2d Cir. 1996) .......................................................................60

*Travelers Indem. Co. v. Northrop Grumman Corp.*,
  3 F. Supp.3d 79 (S.D.N.Y. 2014), *aff'd.*, 677 Fed. Appx. 701
  (2d Cir. 2017) ................................................................................*passim*

*United States v. Alcan Aluminum Corp.*,
  990 F.2d 711 (2d Cir. 1993) ........................................................16, 18, 37

*United States v. Monsanto Co.*,
  858 F.2d 160 (4th Cir. 1988) ....................................................................16

*Westfarm Assocs. Ltd. Pshp. v. Washington Suburban Sanitary Comm'n*,
  66 F.3d 669 (4th Cir. 1995) ......................................................................18

*Zervos v. Verizon N.Y., Inc.*,
  252 F.3d 163 (2d Cir. 2001) .....................................................................12


**Statutes & Other Authorities:**

10 NYCRR §5-1 ...........................................................................................7

28 U.S.C. §1291 ...........................................................................................2

28 U.S.C. §1331 ...........................................................................................2

28 U.S.C. §1367(a) .......................................................................................2

28 U.S.C. §1367(c)(3) .................................................................................59

42 U.S.C. §107 ...........................................................................................24

42 U.S.C. §107(a) ...............................................................................*passim*

42 U.S.C. §113(f)................................................................................45

42 U.S.C. §113(g) ...............................................................................57

42 U.S.C. §9601 ...................................................................................1

42 U.S.C. §9607(a) .............................................................................15

42 U.S.C. §9613(b) ...............................................................................2

vi

## PRELIMINARY STATEMENT

Plaintiff-appellant, Town of Hempstead ("Town"), maintains three public drinking water supply wells known as wells 7A, 8A, and 13 (collectively, "Wells"), serving 50,000 residents in the Levittown Water District ("LWD"). The Wells were contaminated by the hazardous waste sites owned and/or operated by defendants-appellees.[1] In granting Defendants summary judgment, the district court misapplied the law. If affirmed, the district court's decision will penalize the Town for taking appropriate measures to protect the public drinking water supply from contaminants released at the Sites, while rewarding the parties responsible for releasing those contaminants, contrary to the purposes of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. §9601 *et seq.*

---

[1] United States of America and Department of the Navy ("Navy"), owned the Naval Weapons Industrial Reserve Plant ("NWIRP Site"); Northrop Grumman Corporation and Northrop Grumman Systems Corporation ("NG") owned and operated related property ("NG Site"); and the adjoining Hooker/Ruco Site, was owned and/or operated by Covestro LLC ("Covestro"), Bayer Corporation ("Bayer"), and Occidental Chemical Corporation ("Occidental") or their predecessors (collectively, "Defendants"). The NWIRP Site, NG Site, and Hooker/Ruco Site are collectively the "Sites."

**JURISDICTIONAL STATEMENT**

The district court had original jurisdiction over this action pursuant to 28 U.S.C. §1331 and 42 U.S.C. §9613(b) and supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. §1367(a). The February 25, 2025 <u>Memorandum & Order</u> (Vitaliano, J.) ("Order") granted summary judgment to Defendants and dismissed all of the Town's claims (Joint Appendix "[A-]" A-10506-532). On February 26, 2025, a final judgment was entered (A-10533). The Town filed a timely notice of appeal on April 21, 2025 (A-10534). This Court has appellate jurisdiction, pursuant to 28 U.S.C. §1291, over the district court's final Order and Judgment.

**ISSUES PRESENTED**

1. Whether the district court erred in adopting a causation standard inconsistent with §107(a) of CERCLA by requiring the Town to establish more than a minimal causal nexus between the release of hazardous substances at the Sites and the response costs incurred by the Town?

2. Whether the district court erred in determining that the Town failed to establish that Defendants' release of hazardous substances at the Sites resulted in the Town incurring response costs?

3. Whether the district court erred in determining that the Town's response costs incurred were neither necessary nor consistent with the National Contingency Plan ("NCP") under CERCLA?

2

4. Whether the district court abused its discretion in exercising supplemental jurisdiction and dismissing the Town's state-law claims with prejudice?

## STATEMENT OF THE CASE

### A. Relevant Statutory Background

Under CERCLA §107(a), a plaintiff must demonstrate: (1) the defendant fits one of the four classes of responsible parties, which include past and present owners or operators of facilities; (2) the site is a facility; (3) there is a release or threatened release of hazardous substances at the facility; (4) the plaintiff incurred costs responding to the release or threatened release; and (5) the costs and response actions conform to the NCP. *B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1198 (2d Cir. 1992).

### B. Summary Factual Background

The Sites are contiguous, and Defendants conducted manufacturing processes, using solvents containing volatile organic compounds ("VOCs"), which were released at the Sites and formed plumes of contaminated groundwater that migrated off-site (A-2081; A-9305). By 2014, more than 2,000 acres on Long Island were impacted by the plumes of groundwater contamination emanating from the Sites. *Travelers Indem. Co. v. Northrop Grumman Corp.*, 3 F. Supp.3d 79, 84 (S.D.N.Y. 2014), *aff'd.*, 677 Fed. Appx. 701 (2d Cir. 2017) ("*Travelers I*").

3

The New York State Department of Environmental Conservation ("NYSDEC") determined that a western groundwater plume and an eastern groundwater plume originating from the NG Site and NWIRP Site had commingled downgradient of the Sites to form one plume, extending 4.3 miles south, 2.1 miles at its widest point, with the top of the plume over 200 feet beneath ground surface, extending to depths of approximately 900 feet beneath ground surface (A-10474). The Wells are located within the plumes of groundwater contamination which migrated from the Sites (A-374; A-8846; A-8852; A-9172).

### 1. The Sites

In the 1930s, NG and its predecessors commenced operations on the 600-acre NG Site, for manufacturing and testing of naval airplanes, weapons and satellites. *Travelers I*, 3 F. Supp.3d at 84. The NWIRP Site occupied approximately 110 acres on the NG Site and was owned by the Navy but operated by NG (A-2838). The NWIRP Site, established in 1933, was used for research, prototyping, testing, design engineering, fabrication, and primary assembly of military aircraft (A-2838). The Hooker/Ruco Site, a 14-acre site along the north-western boundary of the NG Site and NWIRP Site, began operations in 1945, was owned and operated at various times by Occidental, Bayer, and Covestro, and was a former polymer manufacturing facility (A-3754; A-5302; A-5596-97; A-9379).

4

It is "clear" that "long-term, historical practices created contamination" at the NG Site and NWIRP Site. *Travelers I*, 3 F. Supp.3d at 107. NYSDEC issued Records of Decision ("ROD") in 1995 and 2001 ("OU-2 ROD"), which required remediation of the Operable Unit 2 ("OU-2") regional groundwater contaminant plume emanating from the NG Site and NWIRP Site ("OU-2 Plume"). *Travelers I* at 94-95 (A-2600). Navy issued a ROD for remedial action for the OU-2 Plume for the NWIRP Site in January 2003 and April 2003 (Revision 1) ("Navy ROD"), which is based on and operates in conjunction with the OU-2 ROD (A-2828).

The OU-2 ROD and Navy ROD, "recognize[d] the importance of continued provision of potable water to those communities/populations served by water supply wells that are or that become impacted by site-related contamination." (A-2837). The Public Water Supply Contingency Plan ("PWSCP") was created as part of the OU-2 ROD and Navy ROD. Well 13 was specifically included in the PWSCP as a public supply well that was at risk of becoming impacted by the migrating OU-2 Plume, and Wells 7A and 8A are covered by the PWSCP as supply wells which could become impacted by site-related contamination from the OU-2 Plume (A-2601-2602; A-2837; A-2944-45).

Off-site groundwater impacts from the Hooker/Ruco Site ("Hooker/Ruco Sub-Plume") are the subject of a remedial action plan overseen by the EPA ("Hooker/Ruco OU-3 ROD") (A-5288-92; A-9305). Since "the groundwater

5

contamination associated with the Hooker/Ruco facility has commingled with groundwater contamination from the Northrop and NWIRP sites," the "EPA and NYSDEC agreed to proceed with a coordinated effort to evaluate and develop remedial alternatives to address the commingled plume."[2] (A-5298). The remedy selected in the Hooker/Ruco OU-3 ROD was intended to function "in conjunction with existing and proposed controls addressing the regional VOC groundwater contaminant plume." (A-5406). Those controls include the OU-2 ROD and the Navy ROD, which include the PWSCP.

### 2. The Wells

The Wells draw their water supply from the Magothy Aquifer, which is the primary source of public water supply on Long Island (A-4020; A-4051). *See New York v. Next Millennium Realty, LLC*, 732 F.3d 117, 121, n.1 (2d Cir. 2013). It is essential that all of the in-service LWD supply wells be available to reliably meet the water demands of the LWD (A-4020).

Wells 7A and 8A are situated in the same well field about 100 feet apart in Levittown, New York (A-4021). Well 13 is located approximately one-half mile away (*Id.*). Well 7A (N-8279), Well 8A (N-7523), and Well 13 (N-5303) are all less

---

[2] The term "OU-2 Plume" includes the commingled regional groundwater plume of contamination emanating from all of the Sites.

than 14,000 feet from the center of the NG Site in a south, southwest direction (A-3356; A-3359-60; A-9567-68).

In or about 2013, for the first time, trace concentrations of 1,1-Dichloroethane ("1,1-DCA") and Chloroform were detected in Well 7A, trace concentrations of Freon-113[3] and Tetrachloroethene ("PCE") were detected in Well 8A, and trace concentrations of Freon-113 were detected in Well 13 (A-4087). In or about mid-2013, increasing levels of VOCs were detected in the Wells nearing the maximum contaminant level ("MCL")[4] of 5 ug/l[5] for drinking water (A-2523-26; A-4023; A-4087-88).

The Town retained D&B Engineers and Architects, P.C. ("D&B") to determine the necessary treatment for removal of VOCs from the Wells (A-4023). D&B reviewed data to estimate the maximum influent concentration to design the

---

[3] Freon-113 is a VOC with the chemical synonyms including, but not limited to, Trichlorotrifluoroethane; CFC-113; 1,1,2-Trichlorotrifluoroethane; 1,1,2-Trichloro-1,1,2-Trifluoroethane; Freon TF; and R 113, Chemical Abstracts Service Registry Number 76-13-1 (A-3396-3397; A-3405-06; A-3815; A-4093-4094). The term "Freon-113" will be used throughout with respect to any reference using any synonym and/or trade name associated with that VOC.

[4] 10 NYCRR §5-1 and the requirements imposed by the EPA establish MCL standards for water quality which cannot be exceeded in drinking water. *See also In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 725 F.3d 65, 80 (2d Cir. 2013).

[5] Ug/l is micrograms per liter, which is equivalent to parts per billion. *Id*. at 80, n.2.

treatment for the Wells (A-4052). That review revealed that the VOCs impacting the Wells likely originated from the OU-2 Plume (A-2305-2319; A-2326-37; A-2374; A-2376; A-2378; A-2381-82; A-2387-90; A-2392; A-2396-97; A-2401; A-2406; A-2408-11; A-2413; A-2415-16; A-4025-27; A-4052-59; A-4100-01).

The data obtained by D&B is corroborated by the "formal notification" provided by NG to NYSDEC in July 2012, confirming that site-related contamination exceeded the trigger value for the outpost monitoring well ("MW") providing early warning of the advance of the OU-2 Plume toward Well 13 (A-2340-41). The site-related VOC which triggered the notification to the Town was Freon-113 (A-2339-40).

Freon-113, PCE, 1,1-DCA, Chloroform, and Trichloroethylene ("TCE")[6] – all impacting the Wells – were used, released, and associated with the NG Site and NWIRP Site and are all contaminants in the OU-2 Plume (A-2940; A-3200).[7] The

---

[6] The Wells were removed from service at various times from July 2013 through June 2018, until treatment was approved for those wells, to ensure that those wells would not violate drinking water quality standards (A-4028). Once Wells 8A and 13 were returned to service, low level concentrations of TCE began being detected in those wells (A-4375-82).

[7] A "contaminant of concern" ("COC"), "is a contaminant that is sufficiently present in frequency and concentration in the environment to require evaluation for remedial action." (A-10479). NYSDEC determined that the COCs for the NG Site and NWIRP Site include 1,1-DCA, Chloroform, PCE, TCE, and Freon-113 (A-10479). In addition, "Freon compounds are also present in on-site and off-site groundwater

8

Hooker/Ruco Sub-Plume contains PCE and TCE and evidence exists that Freon-113 was used and likely released at the Hooker/Ruco Site (A-9305; A-9380-89).

Once site-related contamination of Freon-113 was confirmed to exceed the trigger value for the outpost MW for Well 13, NG and Navy were obligated to negotiate with the Town for funding for the treatment for the Wells. NG and Navy failed to negotiate with the Town, contending that the VOC contamination in the Wells originated from unspecified sites located north and west of the Sites (A-2335-41; A-2347-51; A-2424; A-2527-29; A-2987), leaving the Town to take the appropriate action to protect the public drinking supply (A-2934).

The Town constructed treatment for the Wells consisting of packed tower aeration systems ("PTAS") (air stripper technology) with vapor phase granular activated carbon ("GAC") off-gas treatment (A-9589-90). "[B]oth systems were installed in response to an imminent public health hazard" caused by the contamination in the Wells and water demand issues arising from taking the Wells out-of-service and "address water contamination at the endpoint – the wells – and not to permanently remediate the problem" of the OU-2 Plume migrating from the Sites. *Next Millennium*, 732 F.3d at 126-27; (A-4028-30).

_____

at concentrations that exceed SCGs," which are Standards, Criteria and Guidance (A-10484; A-10488).

9

The treatment systems for the Wells were approved by the Nassau County Department of Health ("NCDOH") on authority of New York State Department of Health ("NYSDOH"), with the recognition of NYSDEC, and have been in operation for Well 13 since 2016 and for Wells 7A/8A since 2018 (A-2359-64; A-4043-44; A-4077-80; A-9588; A-9595-98).

## C. PROCEDURAL HISTORY

The Town commenced this action on June 30, 2016 (A-37-55), asserting claims under CERCLA and state law for trespass, nuisance, and negligence, seeking to recover past and future costs incurred for the design, construction, operation, and maintenance of the wellhead treatment systems.

In December 2016, Defendants moved to dismiss the complaint. On September 18, 2017, the district court (Bianco, J.) denied the motions, except dismissed the private nuisance claim against Covestro, Bayer, and the Navy.[8] Thereafter, the district court divided the case into two phases – Phase I was limited to the CERCLA claims and Phase II for the state-law claims.[9] The completion of discovery and dispositive motions was scheduled by phases.[10]

---

[8] Docket No. 77.

[9] Docket Nos. 92 and 95.

[10] Docket No. 130.

10

On December 6, 2021, at the completion of Phase I discovery, Defendants moved for partial summary judgment as to the CERCLA claims.[11] Discovery on the Phase II state-law claims was stayed pending briefing on the Phase I motions for summary judgment.[12]

Thereafter, the district court (Vitaliano, J.) issued the Order, dated February 16, 2025 and entered February 25, 2025, granting summary judgment to Defendants, dismissing both Phase I and Phase II claims with prejudice (A-10506-10532). Judgment was entered on February 26, 2025 (A-10533). The Town timely appealed (A-10534).

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's grant of summary judgment, "viewing the evidence in the light most favorable to the non-moving party and drawing all inferences and resolving all ambiguities in its favor." *Price Trucking Corp. v. Norampac Indus.*, 748 F.3d 75, 79 (2d Cir. 2014) (internal citation omitted)). This Court "must determine whether a genuine issue of material fact exists and whether the district court correctly applied the law." *Keywell Corp. v. Weinstein*, 33

---

[11] Docket entry Order (Vitaliano, J.), dated October 27, 2020 (A-22).

[12] Docket No. 138 and associated Order (Tiscione, M.J.), dated October 30, 2020 (A-23).

11

F.3d 159, 163 (2d Cir. 1994). A "fact is material if it might affect the outcome of the suit under the governing law." *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009) (internal citation omitted). The issue of interpretation of CERCLA is a question of law that this Court reviews *de novo*. *Next Millennium*, 732 F.3d at 126. If legal questions turn on factual issues, a grant of summary judgment is also reviewed *de novo*. *Id.*

This Court reviews a district court's exercise of supplemental jurisdiction for abuse of discretion. *Kolari v. New York Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006). A district court abuses its discretion when "(1) its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision – though not necessarily the product of a legal error or a clearly erroneous factual finding – cannot be located within the range of permissible decisions." *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 169 (2d Cir. 2001).

## SUMMARY OF ARGUMENT

The Order undermines the goals of CERCLA by allowing current and past owners and operators of the Sites, at which it is undisputed that hazardous substances were released and migrated off-site, to create a vast groundwater plume of contamination which stretches for miles in each direction, to avoid responsibility for the cost of the cleanup of those hazardous substances from the downgradient public water supply wells impacted by that contamination. The Town is not required to

12

fingerprint or prove with scientific certainty that the contamination in the Wells is from specific parties.

CERCLA is a strict liability statute, without a requirement to prove causation. Where, as here, the contamination has migrated off-site and impacted public water supply wells, CERCLA requires, at most, a minimal causal nexus. Therefore, the Town need only demonstrate a plausible migration pathway of the contamination from the Sites to the Wells. Such migration has been demonstrated through documentary and expert evidence.

NYSDEC, by implementing the PWSCP, streamlined the process to protect public water supply wells from the deleterious effect of Defendants' contamination of a vast area of the groundwater which is the source of potable water for the Wells. The district court misconstrued what constitutes consistency with the NCP as applicable to this matter. NYSDEC, as the environmental regulatory agency responsible for overseeing the remediation of the OU-2 Plume, purposely separated out the groundwater remediation of the OU-2 Plume from the protection of public water supply wells impacted by the OU-2 Plume. The PWSCP was the culmination of the NCP processes undertaken as part of the remediation of the Sites to ensure the protection of the public water supply wells. The Town's implementation of the treatment systems for the Wells was consistent, and substantially complied, with the

13

terms and goals of the PWSCP and, therefore, is necessary and consistent with the NCP.

The district court abused its discretion in exercising supplemental jurisdiction to dismiss the state-law claims with prejudice when those claims were not ripe for review. Contrary to the district court's determination, the causation standard under the state law claims is analyzed differently than CERCLA claims. Also, if this Court finds that the Town satisfied the causation standard under CERCLA but failed to substantially comply with the NCP, the state-law claims, which are not subject to the requirements of the NCP, should proceed either in the district court or be dismissed without prejudice. Accordingly, Order and Judgment must be vacated and remanded.

## ARGUMENT

## POINT I

### THE DISTRICT COURT ADOPTED A CAUSATION STANDARD INCONSISTENT WITH SECTION 107(a) OF CERCLA

The district court determined, "the critical requirement that a CERCLA plaintiff make a showing of casualty [sic]" but "that does not mean that the applicable liability rules are one size fits all." (A-10515). The district court found that, "numerous circuit courts have determined that a different causation standard applies to plaintiffs seeking to recover in two-site cases; these plaintiffs must show

14

a nexus between the release of contaminants on the primary site and the costs incurred on the downgradient site." (A-10516).

In determining what that "nexus" should be, the district court relied on cases holding that "a plaintiff must 'show that the release at the Site was a substantial factor in incurring downgradient response actions.'" (A-10517, *citing New York v. Adamowicz*, 16 F. Supp.3d 123, 141 (E.D.N.Y. 2014), *aff'd* 609 Fed. App'x 19 (2d Cir. 2015),[13] and *Artesian Water Co. v. Gov't of New Castle Cty.*, 659 F. Supp. 1269 (D. Del. 1987), *aff'd* 851 F.2d 643 (3d Cir. 1988)). The district court found that, "[a]lthough it is clear from CERCLA litigation nationally that two-site cases present the need for a different approach to causality, the Second Circuit has not embraced a singular approach in such cases as binding precedent." (A-10516). The causation standard adopted by the district court is inconsistent with the goals and language of CERCLA and the precedent of this Court.

"Congress specifically rejected including a causation requirement in section 9607(a)." *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1044 (2d Cir. 1985). In "deleting causation language from section 107(a),. . . Congress knew of the synergistic and migratory capacities of leaking chemical waste, and the

_____

[13] The issue of the appropriate causation standard under CERCLA §107(a) was not before this Court in *Adamowicz*. 609 Fed. App'x at 20.

technological infeasibility of tracing improperly disposed waste to its source." *United States v. Monsanto Co.*, 858 F.2d 160, 170 (4th Cir. 1988).

The First Circuit held that, "[t]here is nothing in the statute, its legislative history, or the case law, which requires proof that the defendant's hazardous waste actually have migrated to plaintiff's property, causing contamination of plaintiff's property, before CERCLA liability is triggered. Nor is there anything in that statute suggesting that a 'two-site' case be treated differently than a one-site case, where the issue is whether a release or threat of release caused 'response costs.'" *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 889 F.2d 1146, 1154 (1st Cir. 1989). In *United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 721 (2d Cir. 1993), this Court reiterated that Congress rejected a causation requirement in §107(a), *citing Shore Realty*, *Dedham Water Co.*, and *Monsanto Co.* This Court also held that the plaintiff, is "not required" to "show that a specific defendant's waste caused incurrence of clean-up costs." *Alcan*, 990 F.2d at 721.

In *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 130 (2d Cir. 2010), this Court found that, "CERCLA purposefully lowered the liability bar required to be a PRP" and that the "relaxed liability standard is appropriate when viewed in the context of the language of CERCLA." This Court reiterated that "caution is appropriate when evaluating a motion for summary judgment to dismiss a claim against a PRP in a CERCLA case" because "[e]ach hazardous waste site is

16

unique in its combination of commercial activities, substances present, and history." *Id*. at 130-31.

In cases like *Niagara Mohawk* and this case, where hazardous substances were released at sites over decades in the past, "the type of evidence, be it direct or circumstantial, and its quality, is to some degree impeded by the passage of time and the lack of business records reflecting the day-to-day operations of the industries then present" at the release site. *Id*. Thus, "[w]hen determining CERCLA liability, 'there is nothing objectionable in basing findings solely on circumstantial evidence, especially where the passage of time has made direct evidence difficult or impossible to obtain.'" *Id*. (internal citation omitted). It is only when damages are apportioned that causation is brought into the case. *Id*.

"CERCLA does not require a smoking gun" and "CERCLA liability may be inferred from the totality of the circumstances as opposed to direct evidence." *Id*. at 136. In *Niagara Mohawk*, defendant Portec owned land northeast of the Area 2 site and released hazardous substances on his site, which abutted a creek, with those hazardous substances claimed to have traveled across Portec's property into the creek which, in turn, passed through the Area 2 site. *Id*. at 134-35. This Court held that Portec qualified as a potentially responsible party "because there is evidence in the record that Portec may have deposited hazardous materials that settled in Area 2," recognizing the relaxed causation standard. *Id*.

The district court's adoption of a causation standard which requires more than a minimal causal nexus, or requires the Town to prove that the releases at the Sites were a substantial factor in the Town incurring response costs, is both inconsistent with the goals of CERCLA and this Court's precedent in *Shore Realty*, *Alcan*, and *Niagara Mohawk* that a relaxed liability standard is appropriate in the context of CERCLA, dictating that the Order and Judgment be reversed.

Alternatively, if this Court determines that a different causality standard applies in a two-site case such as this, then it is respectfully submitted that the framework set forth in *Westfarm Assocs. Ltd. Pshp. v. Washington Suburban Sanitary Comm'n*, 66 F.3d 669 (4th Cir. 1995) better serves the goals of CERCLA.

In *Westfarm*, a two-site case, the Fourth Circuit held that, "[t]he plaintiff must prove only that contaminants which were once in the custody of the defendant could have traveled onto the plaintiff's land, and that subsequent contaminants (chemically similar to the contaminants once existing in defendant's custody) on the plaintiff's land caused the plaintiff to incur cleanup costs." 66 F.3d at 681. Under that approach, "once plaintiff has proven a *prima facie* case, the burden of proof falls on the defendant to disprove causation." *Id*. That approach is consistent with CERCLA. *Id*.

In *Castaic Lake Water Agency v. Whittaker Corp.*, 272 F. Supp.2d 1053, 1066 (C.D. Ca. 2003), the court found that, the "*Westfarm* burden-shifting approach is in

18

keeping with CERCLA's broad remedial purpose. . .and is consistent with the 'minimum causal nexus' most courts require under CERCLA." Thus, "in a two-site CERCLA case, the plaintiff meets its burden on summary judgment if it (a) identifies contaminant at its site, (b) identifies the same (or perhaps a chemically similar) contaminant at the defendant's site, and (c) provides evidence of a plausible migration pathway by which the contaminant could have traveled from the defendant's facility to the plaintiff's site." *Id.*

In *Asarco LLC v. Cemex, Inc.*, 21 F. Supp.3d 784, 807 (W.D. Tex., El Paso Div. 2014), also a two-site case, the court concluded that, "CERCLA's goals are better served by the framework laid out by the Fourth Circuit in *Westfarm*." In *California Dep't of Toxic Substances Control v. NL Indus., Inc.*, 636 F. Supp.3d 1092, 1109 (C.D. Ca. 2022), a two-site case, the court concluded that, "[i]n accordance with Congress's probable wishes, the Court is persuaded that 'plausibility' captures the best approach to the release causation inquiry." *See also Cal. Inst. of Tech. v. City of Pasadena*, 2024 U.S. Dist. LEXIS 153082 *18-19 (C.D. Ca. August 23, 2024) (adopting the plausible migration pathway standard, noting that, "[u]nderground migration is considered a plausible pathway for ground water contamination.") (internal citation omitted).

To the extent that the Court determines that the Town is required to demonstrate a causal connection between the hazardous substances at the Sites and

19

the Town's incurrence of response costs, the Court should adopt a relaxed causation standard that requires only a minimal causal nexus wherein the Town's burden is met if it: (a) identifies contaminants in the Wells; (b) identifies the same or chemically similar contaminants at the Sites; and (c) provides some evidence of a plausible pathway, such as groundwater contamination, by which the contaminants could have traveled from the Sites to the Wells. Under that (or any other) causation standard, the Town has demonstrated that the releases of Freon-113, PCE, TCE, 1,1-DCA, and Chloroform at the Sites have plausibly migrated off-site in the groundwater to the Wells, causing the Town to incur response costs to remove those same contaminants from the Wells.

**POINT II**

**THE TOWN ESTABLISHED THAT DEFENDANTS' RELEASE OF HAZARDOUS SUBSTANCES AT THE SITES CAUSED THE TOWN TO INCUR RESPONSE COSTS**

Regardless of the applicable causation standard, the district court erred in finding that the Town failed to satisfy its *prima facie* burden of proof that the releases of contaminants at the Sites caused the Town to incur response costs. The Town provided evidence in opposition to Defendants' motions that: (i) the same hazardous substances in the Wells are COCs in the OU-2 Plume and (ii) the existence of a plausible groundwater pathway by which those hazardous substances could have traveled to the Wells from the Sites.

20

**A.** **Releases of Hazardous Substances at the Sites**

**1**. **The NG Site and the NWIRP Site**

Historically, the main source of wastes on the NG Site and the NWIRP Site were the metal finishing process lines, including degreasing, conversion coating, anodizing, and painting (A-394; A-3340; A-4094-95). Recharge basins were dug directly into the ground throughout the NG Site and NWIRP Site, which were used to dispose of wastewaters, with wastewater infiltrating back into the ground and groundwater. *Travelers I*, 3 F. Supp.3d at 85. Non-contact cooling water and storm water runoff were discharged into the recharge basins located on the southern end of the NG Site (A-3340). The recharge basins received the treated industrial wastewater on the NG Site from the late 1940s until 1981. *Id*. After 1981, the recharge basins were used to discharge non-contact cooling water and storm-water runoff. *Id*.

Sources of discharge included well water supply and open plant drains and sinks. *Travelers I*, 3 F. Supp.3d at 90. The chemical storage, handling, and waste generation and disposal resulted in releases of hazardous substances into drainage sumps, dry wells, and/or direct to the ground surface occurring in the various locations at the NG Site and NWIRP Site, leading to the formation of the OU-2 Plume, containing the same VOCs which traveled to and contaminated the Wells (A-394; A-3338; A-4094-95).

For decades, NG used Freon-113 as a solvent, refrigerant, coolant, and release agent in significant amounts at the NG Site and NWIRP Site (A-2020; A-2607; A-3021-3043; A-3439-3536; A-3564; A-4106-07; A-9547-9553; A-9555-62).

There were fourteen active production wells at the NG Site and seven active production wells at the NWIRP Site used for consumption, processing, and air conditioning (A-2026; A-3573; A-9564). In the 1970s and 1980s, VOCS, including Freon-113, Chloroform, and PCE, were detected in relatively high concentration levels in those production wells, and hundreds of millions of gallons of water were pumped through those wells (A-3044-46; A-3057-59; A-3072-74; A-3353-59; A-3361; A-3577; A-3581; A-3583; A-3585; A-3597; A-3599; A-3601; A-9555-58; A-9563-64).

Non-contact cooling water containing Freon-113 was discharged into the recharge basins on the NG Site and NWIRP Site, with Freon-113 detections in relatively high concentration levels. Industrial discharge and non-contact cooling and storm water exceeded millions of gallons per day (A-3044-3069; A-9562-63). Thousands of gallons of Freon were also stored on-site (A-2037-38; A-3075-78; A-3090; A-9564-65).

Freon-113 was used "rather liberally" in machining processes as a coolant and frequently for cleaning purposes and Plant No. 2 (NG Site) contained a Freon TF Degreaser which principally utilized Freon-113 (A-3087; A-3093-96; A-9565).

22

Significant volumes of Freon-113 were used for various purposes at both NG and NWIRP Sites, resulting in tons of halogenated solvents and freon hazardous waste from cleaning parts and equipment (A-3081-84; A3091-96; A-9564-65). In August 1995, NG identified Freons as part of the Class A-Halogenated Hydrocarbon substances it had used, produced, stored, distributed, or otherwise disposed of since January 1, 1971, for use at the NG Site as a refrigerant and solvent, in the average annual usage of 61,107 lbs. per year (A-3097-3100; A-9566).

In July 2000, Freon-113 was detected at MWs located at the NG Site adjacent to Plant No. 2 and at MWs located off-site south from the Sites (A-2824-25; A-9568). Based on the occurrence of Freon-113 in groundwater and "its use at the site," Freon-113 was added to the list of VOCs monitored in the well network associated with the OU-2 Plume (A-2822-23; A-9568).

The PWSCP specifies VOCs associated with the NG Site and NWIRP Site based on: "frequency of detection in valid groundwater samples; location of detection (i.e., on-site, off-site, upgradient); known source areas; observed biotransformation processes." (A-2940). Freon-113, 1,1-DCA, PCE, TCE, and Chloroform – all detected in the Wells – are included in the PWSCP. *Id*. All of those VOCs have been deemed COCs within the OU-2 Plume (A-3200; A-10479).

23

## 2. The Hooker/Ruco Site

The Hooker/Ruco Sub-Plume includes PCE, TCE, and vinyl chloride monomer (A-9305). Whether or not the Hooker/Ruco Sub-Plume contains Freon-113 does not change the liability of Covestro, Bayer, or Occidental. The Town is not required to prove its case with scientific certainty. *B.F. Goodrich v. Betkoski*, 99 F.3d 505, 526 (2d Cir. 1996) *overruled on other grounds by New York v. Nat'l Servs. Indus., Inc.*, 352 F.3d 682, 685 (2d Cir. 2003). Nor is the Town required to show that a specific defendant's waste caused incurrence of cleanup costs. *Niagara Mohawk*, 596 F.3d at 130. The Court is permitted to base findings "solely on circumstantial evidence, especially where the passage of time has made direct evidence difficult or impossible to obtain." *Id*. at 131. The district court erred in concluding that the Town failed "to make a showing of causality essential to carrying the proof burden CERCLA §107 demands" as to the Hooker/Ruco Site (A-10521-24).

During groundwater sampling in 1989 and 1990, Freon-113 was detected in field results throughout the Hooker/Ruco Site but those results were rejected by Hooker/Ruco based on the assumption of test invalidity (A-3862; A-3866-68; A-3870; A-3878; A-3883-3911; A-9384-85). The EPA questioned whether the results for the Freon-113 detections were "rejected as a result of inappropriate data

24

validation procedures." (A-3919; A-3940). The EPA noted, "'the cold room'[14] was an integral part of the discontinued plastics manufacturing process" and questioned whether Freon-113 "is related to the site related chemical processes that occurred in the cold room." (*Id.*). Occidental merely responded that Freon-113, "was rejected because it was detected in the majority of the laboratory, method blanks, trip blanks and field blanks throughout the study," without further explanation and without responding as to whether the Freon-113 detections were from site-related chemical processes that occurred in the cold room (A-3952-53).

The Occidental Rule 30(b)(6) witness did not know what activities occurred at the cold room and had no knowledge of anything about the cold room (A-3790; A-3792-93). Freon-113 was not included as a test parameter in on-site groundwater sampling and the Occidental designee did not know if the rejection of the test samples for Freon-113 was the reason for that (A-2748-2768; A-3800; A-3805).

Additional evidence shows that Freon-113 was used at the Hooker/Ruco Site. Lists of raw materials used at the site for the calendar year 1974, included the use of Freon-113 under the trade name Freon TF, and for the calendar year 1976, included

---

[14] The Hooker/Ruco Site included a 300-square foot refrigerated building identified as the "cold room." (A-3865; A-3874; A-9385).

25

1,1,1 Trichlorethane ("1,1,1 TCA")[15] (A-3755; A-3772-74; A-3779-80; A-9381). The Occidental Rule 30(b)(6) witness testified that, despite the reported raw material usage of Freon-113 at the Hooker/Ruco Site: (i) he was not aware of the usage of Freon-113 at the site; (ii) he had no knowledge about the purchase of any form of Freon at any point in time for the site; and (iii) was not aware of any documents which identified materials, chemicals, or raw materials used at the site and did not know if any raw material usage forms were prepared after 1976 (A-3791; A-3801; A-3802).

Overlooking the lack of knowledge of Occidental's Rule 30(b)(6) witness, the district court criticized the Town for offering "no proof as to what, if any, use Occidental or the Covestro defendants made of the substance at the Site." (A-10522). However, the Town submitted the raw material list as evidence of Freon-13 use on-site. Moreover, the district court erred in relying on a 1979 Hooker/Ruco interoffice memorandum ("1979 Memo") cited by Occidental, "showing that Freon-113 was neither used, manufactured, nor discharged at the Hooker-Ruco Site" (A-9457-59; A-10522-23), to find no evidence of use of Freon-113.

The 1979 Memo itself conflicts with the raw material form which specifically identifies Freon TF as a chemical "purchased and used" at the Hooker/Ruco Site (A-

---

[15] 1,1 DCA (one of the hazardous substances detected in Wells 7A/8A) is derived from a breakdown of 1,1,1 TCA (A-10077).

3755; A-3774). The 1979 Memo was prepared in response to a request from NYSDEC (not included in the exhibit) and merely referenced that "Trifluorotrichloroethane" was neither used, manufactured, or discharged at the Hooker/Ruco Site. It does not specify if the response was limited to the specific chemical "Trifluorotrichloroethane" or whether it also included the trade names for that chemical, such as Freon TF (A-9457-58).

The 1979 Memo also indicates that 1,1,1 TCA was used or manufactured but not discharged at the Hooker/Ruco Site, explaining that it was "temporarily used in limited quantities in some of our specialty polyurethane coatings, but not discharged in any of our effluents." (A-9458-59). However, the 1979 Memo fails to identify the period of time in which 1,1,1 TCA was used; the quantities of such use; how the chemical was used; and whether any of that use resulted in releases to drains, sumps, wells, and groundwater other than by discharge in effluents. The 1979 Memo does not address any other time period after 1979, and does not conclusively establish anything.

Occidental issued a final design report for the treatment of the Hooker/Ruco Sub-Plume, containing a table identifying the chemical compounds which had been detected at the Hooker/Ruco Site within the preceding 12-year period of time (A-3998). Freon-113, Chloroform, TCE, and PCE, were included in that table, with a maximum concentration attributable to Freon-113 of 50 ppb in water (A-3998). The

27

district court erroneously discounted that evidence because of a reference in the report that the compounds listed in the table were previously in soil and groundwater "at and in the vicinity" of the Hooker/Ruco Site (A-3996; A-10523). Yet, the table itself specifically identifies the listed compounds previously detected "at the site" (A-3998). The Occidental Rule 30(b)(6) designee did not know how the table was prepared; how the maximum concentrations were obtained; and how and from where the Freon-113 concentration of 50 ppb was determined (A-3803-04).

The evidence on the motions is to be viewed in the light most favorable to the Town, with all inferences and ambiguities resolved in the Town's favor, especially in a case such as this, where the evidence can be "impeded by the passage of time and the lack of business records reflecting the day-to-day operations of the industries." *Niagara Mohawk*, 596 F.3d at 131. The district court erroneously concluded that the Town's evidence as to Freon-113 use at the Hooker/Ruco Site "rests on speculation contravened by compelling evidence offered by Occidental that Freon-113 was never used in any of the processes conducted at the Site." (A-10523). That "compelling evidence" amounts to the 1979 Memo, which is not determinative on the issue and conflicts with the raw material lists provided by Hooker/Ruco. Moreover, it is undisputed that PCE and TCE were released at the Hooker-Ruco Site which is part of the OU-2 Plume and which caused the Town to incur response costs.

28

*See Niagara Mohawk*, 596 F.3d at 130 (the Town is not required to show that a specific defendant's waste caused incurrence of cleanup costs).

**B.      Plausible Pathway of Migration to the Wells**

The Town submitted "more than evidence of spatial proximity to show causation and survive the motions for summary judgment." (A-10521), including evidence of a plausible groundwater pathway as to how the hazardous substances released at the Sites could have traveled to the Wells.[16]

**1.      Groundwater Flow**

The district court erroneously concluded that the Town's expert agreed that the current groundwater flows southeast while the Wells are located southwest of the Sites (A-10518). The Town's expert specifically noted that while current groundwater flow in the area is recognized to be to the south and slight southeast, the operation of the on-site production wells for decades affected natural groundwater flow directions and "once those releases reached the groundwater

---

[16] The district court's reliance on *DVL, Inc. v. GE Co.*, 811 F. Supp.2d 579 (N.D.N.Y. 2010), *aff'd.*, *DVL, Inc. v. Niagara Mohawk Power Corp.*, 490 Fed. App'x. 378 (2d Cir. 2012), is misplaced. In *DVL*, testing for PCB at the DVL Site was always negative; the only evidence was the proximity of GE's land to the DVL Site; and the lack of expert evidence that the water flowing from GE's plant to the DVL Site contained PCBs was insufficient to establish GE as a PRP. 490 Fed. App'x. at 383. Here, on the other hand, the outpost MWs for Well 13 and the Wells have all sampled for site-related VOCs, including Freon-113, and the Town has submitted expert and other evidence demonstrating how the hazardous substances released at the Sites could migrate to the Wells.

would have also significantly shifted them to new and various locations on the NG/NWIRP properties." (A-394). Occidental's expert described the regional groundwater flow, "as a general statement the groundwater flow is to the south and in some areas generally to the south/southeast." (A-8859). Navy determined that, "groundwater flow is to the south southeast near Hempstead Turnpike and then appears to shift to the south and then to the south southwest near Southern State Parkway." (A-1921).

NG acknowledged that cones of depression formed by the various on-site production wells, "made local variations in the overall groundwater flow pattern difficult to predict" (A-3341). Non-contact cooling water discharged into the recharge basins, in which the "[h]istorical total pumpage and recharge volumes have been as high as 12 to 14 MGD," had "the potential to greatly affect local water-level elevations and hence, local groundwater flow patterns," allowing VOC contaminants to migrate off-site (A-2027; A-3341; A-4196).

The groundwater model prepared by NG for evaluating remedial alternatives of the groundwater contamination identified the Wells as reaching peak concentration of VOCs from the OU-2 Plume by 30 years, with concentrations of less than 1 ppb (A-2036-38; A-3368; A-3370; A-4199; A-9565-67). Aside from the accuracy of the time or concentration levels, the model contemplated that the Wells

30

*would* be impacted by the OU-2 Plume,[17] corroborating that it is plausible, and a nexus exists, that the OU-2 Plume could travel to the Wells.

In determining outpost MWs to provide early warning of the OU-2 Plume to downgradient public supply wells, NG requested an estimate of the time required by the Town to take the necessary steps to construct and implement a treatment system once notified that treatment of groundwater may be necessary, which the Town provided (A-2039-2040; A-3602-05; A-9568-69). There would have been no need to include the Town in the request for information to identify locations for outpost MWs to provide early warning of the OU-2 Plume if it was implausible that the OU-2 Plume could travel to the Wells. Moreover, including Well 13 in the PWSCP (based on modeling by NG and Navy) further corroborates that it was understood and plausible that the VOCs in the OU-2 Plume could travel to and impact the Wells. More importantly, the Wells are located within the OU-2 Plume, thereby confirming that it is likely that the site-related VOCs traveled to and impacted the Wells (A-3741; A-9172).

---

[17] In those instances where the VOCs were not calculated to arrive at a particular supply well, the model indicated "not applicable" and/or 0 ppb throughout the entire duration of simulation, which was not the case with the Wells (A-3370).

31

## 2. Groundwater Modeling in the PWSCP

The PWSCP utilized groundwater modeling "to determine that the following supply wells downgradient of the leading edge of the lower portion of the plume have the potential to have VOC detections related to the plume: N5303 (Town of Hempstead [Levittown] Water District)…" (Well 13) (A-2944). Based upon its determination Well 13 was a "potential receptor" of the OU-2 Plume, outpost MWs were installed for Well 13 (A-2944).

Thus, NG and Navy's own groundwater modeling – included as part of the PWSCP – unequivocally recognized Well 13 as a "potential receptor" of the OU-2 Plume. The district court's attempt to minimize that finding by concluding that, "the outpost monitoring well for Well 13 was installed only as a "conservative measure" per the characterization in the groundwater modeling report (A-10518), fails to recognize that the modeling established that Well 13 was a potential receptor of the OU-2 Plume and it is plausible that site-related contaminants could travel by groundwater to Well 13.

The modeling determined that outpost MWs OW4-1 and OW 4-2 (also known as BPOW 4-1 and BPOW 4-2) were to provide early warning of the migration of the OU-2 Plume to Well 13 (A-2949). Well 13 was located in a southwest direction from those outpost MWs, further corroborating that: (i) it was plausible that Well 13 was

a "potential receptor" of the OU-2 Plume and (ii) that the migration of the OU-2 Plume toward Well 13 could be in a south-southwest direction (A-2954).

That is what occurred – in March 2009, BPOW 4-1, and in January 2010, BPOW 4-2, began experiencing detections of site-related Freon-113 (with increasing detections until and after the "trigger value" was confirmed in July 2012), thereby triggering the "formal notification" from NG to the NYSDEC that site-related VOC contamination was confirmed in the outpost MWs for Well 13 (A-2050; A-9579; A-3616-23; A-2340-41). Thereafter, the same site-related Freon-113, along with site-related Chloroform, 1,1-DCA, PCE (and later TCE) were detected in the Wells (A-2523-26; A-4023; A-4087-88), confirming that the Wells were actual receptors of site-related VOCs.

### 3. New York State Source Water Assessment Plan ("SWAP")

NYSDOH and NCDOH prepared SWAP reports for the Wells, which delineate well recharge areas to predict groundwater flow to each supply well to provide pathway information regarding the origins of source water and the likelihood for contaminants to affect particular wells (A-2279; A-2305-20; A-4025; A-4053-54). The SWAP maps depict the contributing area of the Wells intersecting the NG Site and the NWIRP Site and are consistent with the findings of the PWSCP

33

groundwater model (*i.e.*, that the OU-2 Plume emanating from the Sites could migrate to impact the Wells)[18] (A-2305-19; A-4053-54; A-4100-01).

### 4. Freon-113 Groundwater Plume

Navy requested an optimization review of the OU-2 Plume remedy, "by a team of independent nationally-recognized experts in chlorinated solvent impacts to groundwater." (A-2534).[19] The Remedy Optimization Report ("Optimization Report") noted that, "there are multiple widely dispersed plumes or fingers" and that "changes in pumping rates of the supply wells over time, exert considerable influence on groundwater flow and plume migration" such that "estimating the velocity and strength of groundwater flow and plume migration will continue to be a challenge." (A-2542; A-2544). The Optimization Report further noted that the "plume currently is not well defined along its eastern and western boundaries,

---

[18] NG's expert, Dr. Nathan Epler, attempts to minimize the significance of the SWAP data and maps by noting that more accurate models of the area have been produced since the SWAP model was developed, noting as an example a discrepancy in the flow direction for supply wells further west of the Wells (A-10397). However, Dr. Epler fails to account for the fact that the recognized groundwater flow direction in the area west of the Wells is to the southwest (A-3738-39; A-9601-02).

[19] The Town's expert witness, Richard Humann, P.E. ("Humann"), was selected by Navy as one of the nationally-recognized experts to serve on the technical team (A-2532; A-2567).

especially down-gradient of the On-Site Containment System." (A-2544). That area includes the Wells.

Consistent with the Optimization Report, Humann determined that the OU-2 Plume is comprised of a heterogeneous combination of a series of individual VOC plumes which originated from different locations and at different times on-site and commingled together either on-site or off-site, at varying proportions (A-394-95; A-4101).[20] There is a distinct Freon-113 plume emanating from the Sites along the western boundary of, and commingled with, the overall OU-2 Plume based on the distribution of maximum Freon-113 concentrations detected in the MW and vertical profile boring ("VPB") network, which demonstrate a Freon-113 plume commingled in non-discreet fashion originating at the NG Site and NWIRP Site within the western boundary of the overall groundwater plume (A-394-96; A-4102). This distinct Freon-113 plume is evident along with the western edge of the OU-2 Plume, where Freon-113 has significantly higher concentrations (A-4102). The primary

---

[20] The expert declarations submitted by the Town in opposition to Defendants' motions were "proper because they simply restate and provide additional detail to the views expressed in each expert's report." *Hopkins v. AMTRAK*, 2015 U.S. Dist. LEXIS 196952 at *3 n.2 (E.D.N.Y. Aug. 20, 2015); *E*Trade Fin .Corp. v. Deutsche Bank AG*, 2008 U.S. Dist. LEXIS 46451 at *1-2 n.1 (S.D.N.Y. June 13, 2008) ("[T]he submission of a declaration from an expert that is consistent with his or her timely-disclosed expert report is perfectly proper when offered in support of or opposition to a motion for summary judgment.") (internal citation omitted).

TCE part of the overall plume is characterized by higher concentrations of TCE further east from the western side of the OU-2 Plume (*Id.*).

The largest concentrations of Freon-113 are located on the western side of the OU-2 Plume and form a north-south spine from the Sites to the Wells (A-395-96; A-401; A-3193; A-3214-15; A-4117-18; A-8758). The western side of the OU-2 Plume has the lowest concentrations of TCE detections (A-3194; A-4117-18). There is a Freon-113 plume within the greater TCE plume, and the proportions are different and the TCE plume does not evenly overlap the Freon-113 plume (A-3277-91; A-4119-21). Freon-113 contamination has migrated from the Sites to the west that does not have TCE to the same extent that it has Freon-113 (*Id.*).

Navy acknowledged, "there is evidence of a relatively pure Freon-113 plume (VPB-165) along the western edge of the Deep Western Plume (OU2)" but claimed, without proof, "it does not appear to be associated with the former NWIRP Bethpage or Northrop Grumman facilities" and "appears to be influenced by additional plumes further north and west of the former NWIRP Bethpage and Northrop Grumman facilities." (A-1916). Navy's claims were based on its characterization of TCE as the "primary" component and Freon-113 a "minor" component of the OU-2 Plume. (*Id.*). Navy recognized that the "multiple sources" of the "Deep Western Plume (OU2)" did, however, "include the former NWIRP Bethpage and Northrop Grumman facilities." (A-1910).

36

Navy attributes VOCs emanating from the NWIRP Site only if the VOCs contain TCE at a concentration of at least fifty percent or higher in all groundwater analysis that it performs (A-1763). Yet neither the Navy ROD, the OU-2 ROD, nor the PWSCP set forth any criteria that TCE must be in a ratio of greater than fifty percent to be considered to be in the OU-2 Plume. Navy's threshold requirement is contrary to CERCLA and the precedent of this Court. *Alcan*, 990 F.2d at 721-22.

Whether TCE is considered the "primary" contaminant of the OU-2 Plume, it is not the only contaminant, and each of the VOCs detected in the Wells are COCs included in the OU-2 Plume (A-10479). Even if there are other contributors to the OU-2 Plume, Defendants "may not escape liability merely because other causes. . . have contributed to the result." *Artesian Water Co.*, 659 F. Supp. at 1283.

The district court erroneously questioned "why LWD is the only water district allegedly affected by the OU2 plume that had only Freon-113 present in its wells." (A-10520).[21] The answer is that the Wells are the westernmost supply wells impacted by the OU-2 Plume, whereas other water districts are located further east and are likely impacted by a portion of the OU-2 Plume which has different concentration levels of VOCs (A-394-6; A-4102). No other supply wells are within

---

[21] As noted, Freon-113 was not the only VOC detected in the Wells.

the north-south spine of the distinct Freon-113 plume portion of the OU-2 Plume from the Sites to the Wells.

### 5.    On-Site Containment System

The district court erroneously found that the distinct Freon-113 plume was "due to 'voids' in the ONCT at the Site." (A-10520).  The distinct Freon-113 plume developed as a result of decades of the release of Freon-113 and other VOCs at the Sites, which migrated off-site *before* the ONCT system was installed in 1998. Contaminants in the aquifer located south of the south recharge basin group on the NG Site would not be remediated by the ONCT system (A-2027; A-4196). Similarly, "the plume is a result of dissolved VOCs that left the source as many as 60 to 70 years ago." (A-2547).

Humann opined that (i) an approximate 300-foot void in the ONCT system exists from the bottom of the ONCT extraction wells to the bottom of the Magothy Aquifer, whereby site-related VOCs can migrate off-site since the operation of that system in 1998; and (ii) that horizontal gaps exist between the ONCT wells, allowing contamination to bypass the wells and flow off-site (A-395; A-4113-14).  Whether NYSDEC has determined the ONCT system to be effective does not mean it is fool-proof and completely captures site-related contamination, nor does it mean that the voids and gaps under and between the ONCT wells do not exist, especially since the majority and highest concentrations of Freon-113 detected in the OU-2 MW network

38

are at depths of 565 to 680 feet below ground surface and lower than the depths of the ONCT wells (A-395).

### 6. Freon-113 and TCE as Groundwater Contaminants

The Town's expert, Timothy J. Hazlett, Ph.D., prepared a capture zone analysis of the Wells and opined (in his joint report with Humann [the "H2M Report"]) on the movement and mobility of vicinity groundwater and site-related contaminants (A-392). The district court erroneously "disregarded" the Hazlett Declaration (A-4123-42) "under the "Sham Affidavit" rule, incorrectly concluding that "it contradicts prior sworn testimony previously offered on behalf of the same party that the two substances would travel at the same rate of speed at the concentrations detected in the plume." (A-10519).[22]

---

[22] The "Sham Affidavit" rule "does not apply if the deposition and the later sworn statement are not actually contradictory." *Palazzo v. Corio*, 232 F.3d 38, 43 (2d Cir. 2000). A contradictory sworn statement is viewed "merely as part of the summary judgment analysis, subject to the same *de novo* review as other aspects of the summary judgment question." *Butler v. Raytel Med. Corp.*, 150 Fed. App'x. 44, 46 n.2 (2d Cir. 2005). In addition, "[i]f there is a plausible explanation for discrepancies in a party's testimony, the court considering a summary judgment motion should not disregard the later testimony because of an earlier account that was ambiguous, confusing, or simply incomplete." *Langman Fabrics v. Graff Californiawear*, 160 F.3d 106, 112 (2d Cir. 1998), *amended on other grounds by*, 169 F.3d 782 (2d Cir. 1998). In the event of an inconsistency between a declaration and prior sworn testimony on an issue, "the court may disregard the inadmissible parts and consider the rest of the affidavit." *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 579 (2d Cir. 1969) (internal citation omitted).

In the H2M Report, Dr. Hazlett explained that the densities and dynamic viscosities of each chemical are important considerations with respect to the transport of Freon-113 and TCE in the groundwater flow system (A-397-98). He opined that TCE and Freon-113 groundwater plumes of similar quantity sourced from the same place and time would "tend to separate by approximately 8% by density and viscosity effects alone under other identical subsurface conditions." (A-398).

Dr. Hazlett testified at deposition that, "if we put Freon into the ground somewhere north on the site and we put TCE into the ground under the same conditions and we let it get into the groundwater system and flow along, based purely on the physics of the fluids themselves. . .they tend to differentiate. . . .[and] have different velocities in groundwater over time. And. . .a differentiation as you move further away from the site is likely in the arrival time of these contaminants with Freon typically arriving faster." (A-1292-93; A-1350-51). The analysis was prepared to calculate the maximum differentiation of the chemicals, and then "to find the range of behavior falling in between there somewhere." (A-1345). Under that analysis, the greatest difference in the velocity of the Freon-113 and TCE would be eight percent (representing an "upper echelon") but even if both substances were completely dissolved in the groundwater, the differentiation would be smaller but there would still be some effect (A-1345-47).

40

The Hazlett Declaration is consistent with the H2M Report and Dr. Hazlett's deposition testimony. The deposition testimony explains the methodology for Dr. Hazlett's opinions for determining the differentiation in separation of the chemicals in groundwater; that the eight percent differentiation represented an "upper echelon"; and that whether in free product to dissolved product, some differentiation in movement would result based on the ratio of the density and dynamic viscosity of the chemicals.

The Hazlett Declaration was erroneously disregarded and should have been considered in opposition to the Defendants' motions to demonstrate a disputed issue of fact as to the groundwater movement of Freon-113 and TCE. Even assuming some material inconsistency between the Hazlett Declaration and the deposition testimony existed, then only those paragraphs deemed inconsistent (A-4131-33; A-10519, n.7) should have been disregarded. *See Perma Research & Dev. Co.*, 410 F.2d at 579.[23]

---

[23] The issue as to whether or not there is a differentiation in the velocities of Freon-113 and TCE in groundwater presents a battle of the experts which "bespeaks of a dispute of material fact for purposes of CERCLA liability." *Niagara Mohawk*, 596 F.3d at 136.

### 7. Capture Zone Analysis of the Wells

Dr. Hazlett prepared a capture zone analysis of the Wells, representing from where in the Magothy Aquifer water will flow to the Wells over a given period of time (A-396; A-4140). That analysis demonstrates that VOCs from the OU-2 Plume are within the capture zones of the Wells (A-399-400; A-403; A-4140-42), which is consistent with the findings of the SWAP reports (A-2276-19); the groundwater modeling by NG (A-2676-77); the groundwater flow and transport model as part of the PWSCP (A-2930-78); and the groundwater modeling by Navy to determine trigger values for the outpost MWs for the PWSCP (A-3292-3325), that a plausible groundwater pathway exists by which the VOCs from the Sites could, and did, travel to impact the Wells.

### 8. Plausible Migration Pathway from the Hooker/Ruco Site

The contamination from the Sites commingled through advected transport, where groundwater from the different sources at the Sites would intermingle (A-8724). Upon commingling, the source of TCE and PCE VOCs would be difficult to determine (A-8726). Therefore, the Hooker/Ruco OU-3 ROD included the remediation controls in the OU-2 ROD and the Navy ROD, incorporating the PWSCP. For the same reasons discussed above, the Town has demonstrated a plausible groundwater migration pathway of the OU-2 Plume from the Hooker/Ruco Site to the Wells.

42

The district court erroneously found that the substances emanating at the Hooker/Ruco Site would not have migrated to the Wells in the relevant time period (A-10521-22). Dr. Johnson (Occidental's expert) determined that the advective transport distance from the Hooker/Ruco Site to Well 13 as approximately 7,770 feet, but also calculated that the dispersive transport front (where low dissolved concentrations of contaminants could be found) would extend over 2,500 feet in front of the advective transport front, meaning that the aggregate distance of the advective and dispersive transport fronts would be approximately 10,270 feet (A-9136-37). That distance matches the distance Dr. Johnson used to measure from the southern discharge basins on the NG Site to Well 13 (A-9135). Once the VOCs from the Hooker/Ruco Site commingled with the VOCs at the NG Site and NWIRP Site, the same transport calculation as measured from the southern boundary of the NG Site, would apply to all the Sites.

Dr. Johnson's transport calculation was based on a travel (seepage) velocity of 0.39 feet per day (142 feet per year); a hydraulic conductivity of 50 feet per day; and a time period of 55 years – measured from 1955 through 2010 (A-9135-37). However, Dr. Johnson acknowledged that operations at the Hooker/Ruco Site began in 1945, so if the additional 10-year time period is included and measured from 1945 through 2010, 1,400 feet would be added to the travel distance (A-8808-09). Extending the time from 2010 to 2013 (when VOCs were detected in the Wells),

43

would add another 425 feet. Including the additional distance of 1,825 feet to the advective and dispersive transport fronts, results in a distance of approximately 12,000 feet. That distance would account for the time VOCs released at the Hooker/Ruco Site would travel to, and become commingled with, the groundwater contamination at the NG Site and NWIRP Site, and would also fall within the distances calculated by Dr. Johnson (A-9135).

The inputs utilized by Dr. Johnson are inconsistent with those utilized by Navy in developing the trigger values for the outpost MWs for the PWSCP. In particular, Navy utilized the hydraulic conductivity of 75 feet per day and determined that the resultant groundwater (seepage) velocity as 365 feet per year (1 foot per day) (A-3297). Utilizing a groundwater velocity of 365 feet per year, the distance over a 55-year period, as originally contemplated by Dr. Johnson, yields a travel distance of 20,075 feet – clearly sufficient to cover the purported 15,000 feet (as per Dr. Johnson) from the Hooker/Ruco Site to Well 13 (A-9137). If the additional 1,825 feet is added, that distance would be almost 25,000 feet.

Similarly, the Optimization Report determined the approximate plume velocity as 285 feet per year, with an estimated range of 142 feet per year to 570 feet per year (A-2582-84).[24] Utilizing the 285 feet per year parameter yields a travel

---

[24] The decision of Dr. Johnson to use the 142 feet per year parameter represents the low end of that range.

distance from the Hooker/Ruco Site exceeding 15,000 feet over a 55-year period of time.

While a plausible migration pathway exists from the Hooker/Ruco Site to the Wells, Dr. Johnson also determined, "that advective and dispersive transport will produce migration of dissolved chlorinated compounds over a distance of 12,000 feet" which "clearly supports that the impacts to the LWD wells must be derived from the NGBF/NWIRP operations." (A-9244).

**9.  Other Potential Sources of Contamination**

The district court erroneously found that, "evidence indicates there are sources of Freon-113 upgradient of the LWD Wells and west of the NWIRP Site." (A-10517-18).  However, this is irrelevant.  The Town is not obligated to show that a specific defendant's waste caused the incurrence of cleanup costs.  *Niagara Mohawk*, 596 F.3d at 130.  Nor is the Town obligated to rule out any other potential sources of the hazardous substances.  *See 235 Metro Park Assocs. v. T.H. Green Elec. Co.*, 2007 U.S. Dist. LEXIS 106477 *18 (W.D.N.Y. 2007) ("Even assuming. . .that defendants could point to evidence in the record. . . that another party contributed to the contamination, such evidence would not alter the overwhelming and uncontroverted evidence that defendants' business activities were a proximate cause of contamination found on the site.").  Defendants can pursue claims for contribution, pursuant to CERCLA §113(f), against other potentially responsible parties.  *See also*

45

*Artesian Water Co.*, 659 F. Supp. at 1283 (Defendants "may not escape liability merely because other causes. . .have contributed to the result.").

Even if it were appropriate to consider other potential sources of contamination, that does not diminish Defendants' liability. NG has acknowledged that other potential sources of the VOC contaminants in the Wells "are as yet unidentified." (A-10401).

The data as to certain Hicksville Water District supply wells ("HWD Wells") does not indicate any detections of Freon-113 prior to 2018 – years after Freon-113 was detected in both the outpost MWs for Well 13 and the Wells (A-4383-86; A-4389; A-4391). NG suggests that Freon-113 may have been in the HWD Wells before that time (A-10398). Yet, the data cited by NG goes back to 2010 for the detections of other VOCs in the HWD Wells, suggesting there was no reason to test for Freon-113 in those wells prior to 2018 (A-4383-89). Regardless, NG has presented no evidence of Freon-113 detections in the HWD Wells prior to 2018.

Whether LWD supply wells 1A, 2A, 5A, and 6B had detections of VOCs (A-4370) also fails to support Defendants' argument. LWD Wells 1A and 2A were the subject of this Court's decision in *Next Millennium*, 732 F.3d 117, where the source of the contamination of those wells was the superfund site known as the New Cassel Industrial Area ("NCIA"). More importantly, groundwater flow in the area of NCIA was determined to be in a south-southwest direction (*i.e.*, away from the Wells) (A-

46

3738-39). That fact was also acknowledged by NG's expert Dr. Epler (A-10405). Thus, NCIA could not have been the source of the VOC contamination in the Wells, which means that the potential sources of contamination in and around the NCIA site noted by Defendants (A-3743-44) could not have been the source of contamination of the Wells.

As to Wells 5A and 6B, the only evidence presented (on reply) indicated that Freon-113 was detected in Well 5A in low detection in June 2015 (A-10400). That information is irrelevant since, at best, it only shows: (i) Freon-113 in the upgradient Well 5A two-years after Freon-113 detections in the downgradient Wells and (ii) no evidence of any Freon-113 detections in Well 6B, located next to Well 5A (A-4391).

The "one documented Freon-113 release" cited by Navy is also irrelevant (A-1511; A-1542). That release, at the Servo Corporation, located north of the Sites, occurred in October 1985; involved a spill of only 10 to 15 gallons of 900V Solvent which contained 25% Freon-113 by weight (less than 4 gallons of Freon-113); the spill was cleaned-up; and no public supply wells were suspected of being within the contamination boundary (A-2075-76; A-3750-52), corroborating that it is implausible for that release to have migrated to impact the Wells. Similarly, any suggestion that dry cleaners in the area are potential sources of VOCs is also irrelevant since no defendant has offered any evidence showing any releases of

47

Freon-113 (or any other VOC) from any dry cleaners or the volume of any such releases in the magnitude of those released at the Sites (A-10404; A-10461).

On the other hand, the MW-179D cluster, part of the OU-2 Plume MW network, located west of the Sites between the HWD Wells and the Wells, revealed no detections of Freon-113 but TCE was detected in concentrations exceeding 100 ppb in groundwater sampling (A-3278; A-3289-91; A-4121-22). If other sources north and west were the source of the Freon-113 contamination in the Wells, it would be expected that Freon-113 would be detected in the MW179D cluster. Yet, that was not the case.

NG's attempt to refute that evidence by citing to the sampling data for VPB 176 fails (A-10406). VPB 176 is west of the Sites and southeast of the MW179D cluster, between the MW179D cluster and the Wells. If other sources north and west of the Sites were the source of the Freon-113 impacting the LWD Wells, it would be implausible for that Freon-113 to impact the HWD Wells, bypass the MW179D cluster, and then show up in VPB 176 (A-3289-91; A-10270-71). The likely explanation is that the VOC contamination detected in VPB 176 emanates from the Sites since VPB 176 is downgradient from the Sites while the MW179D cluster is not. Thus, the evidence of other potential sources of the VOC contamination impacting the Wells is merely speculative and insufficient to support awarding Defendants' summary judgment.

48

Defendants are liable under the CERCLA claims as past and present owners and/or operators of facilities at which hazardous substances were released and plausibly migrated off-site to cause the Town to incur response costs. That outcome is the same regardless of which causation standard is utilized since the Town demonstrated a nexus between the releases at the Sites and the incurrence of response costs. As the Town satisfied its *prima facie* burden of proof, and viewing the evidence in the light most favorable to it, the Town demonstrated the existence of genuine issues of material facts in dispute. As such, summary judgment should not have been granted dismissing the Town's claims.

## POINT III

### THE TOWN'S RESPONSE COSTS WERE NECESSARY AND CONSISTENT WITH THE NATIONAL CONTINGENCY PLAN

The district court erroneously concluded that the Town failed to demonstrate that its response costs were necessary and consistent with the NCP (A-10524-30).[25]

---

[25] The district court did not decide whether the response was a removal or remedial action, finding that the Town did not substantially comply with the standards for removal actions (A-10525). If necessary, the response should be deemed a removal action under the rationale of *Next Millennium*, 732 F.3d at 126-129; *MPM Silicones, LLC v. Union Carbide Corp.*, 966 F.3d 200, 222 (2d Cir. 2020). The Town substantially complied with the NCP requirements for removal actions or demonstrated genuine issues of material facts regarding substantial compliance for removal actions under the NCP. (A-4016-18) (the starting point for NCP compliance would be the PWSCP, leaving the remaining steps of the NCP process, the remedial design and action, which NG's compliance expert acknowledged the Town completed).

49

The district court failed to recognize that the opportunity for public comment, the performance of an remedial investigation/feasibility study ("RI/FS") or an Engineering Evaluation/Cost Analysis, and cost analysis were all performed as part of the remediation of the Sites which culminated in the NYSDEC directing the implementation of the PWSCP.

In *Niagara Mohawk*, this Court "squarely addressed whether compliance with a state consent decree is sufficient to prove adherence to the National Contingency Plan" and held that, "[o]ne way of establishing compliance with the national plan is to conduct a response under the monitoring, and with the ultimate approval, of the state's environmental agency." 596 F.3d at 136-37. Under the rationale of *Niagara Mohawk*, the implementation of the PWSCP by the NYSDEC as part of the required remediation of the NG Site and NWIRP Site, and the Town's compliance therewith, constitutes compliance with the NCP.[26]

The OU-2 ROD noted that, "[t]he remedy selected is not inconsistent with the" NCP (A-2600).[27]  NYSDEC anticipated that NG and Navy, "will enter into

---

[26] At a minimum, whether the Town substantially complied with the PWSCP presents genuine issue of material fact for trial.

[27] The OU-2 ROD and Navy ROD were issued as a result of NG and Navy completing a RI/FS, engaging in a public comment period, and addressing other procedural requirements set forth under the NCP.

future agreements to implement this policy [PWSCP]. . .with all water districts affected by site-related contamination." (A-2621).[28]

If a public supply well, "has been or is in imminent danger of being impacted by. . .site-related contaminants, then wellhead treatment or comparable alternative measure(s) [29] for the impacted public water supply well(s) will be necessary. This determination will be made by NYSDEC, NYSDOH, and the Nassau County Department of Health in conjunction with the potentially impacted water district." (A-2631). Significantly, "any costs associated with implementation of the selected remedy will be borne by the potential responsible parties." (A-2667). Per NYSDEC, "public water supply wells are never considered part of any groundwater remediation strategy." (*Id.*). When treatment is necessary for continued operation of a supply well, it is to provide, "potable water to the public, and [is] not part of any groundwater remediation strategy. This has been clarified in the ROD by separating

---

[28] The Navy ROD adopted the OU-2 ROD and incorporated the PWSCP (A-2829). The Navy ROD was made in consultation with NYSDEC and NYSDOH (A-2834).

[29] "The option of 'comparable alternative measures' addresses the concern of replacing an existing supply well with a new well at a different location, or providing some other means to maintain a suitable potable water supply." (A-2671).

51

those measures addressing public water supply issues from those measures addressing groundwater remediation." (A-2667).[30]

The treatment for VOC removal at impacted public water supply wells "has consisted of packed tower aeration (also known as 'air stripping'), granular activated carbon (GAC) filtration or, in select cases, some combination of both" (*id.*) – the exact treatment measures utilized by the Town for the Wells. NYSDEC intended that water districts be, "able to select the most appropriate course of action for affected wells in their district." (A-2667). The public water supply wells "are being treated solely because they have been impacted by the site." (A-2669).

Once a trigger value is confirmed for an early warning outpost MW, "this signifies that wellhead treatment. . .is required" and "negotiations with the potentially affected water district(s) will commence" so that "funding for wellhead treatment. . .can be negotiated and provided to the water district(s)." (A-2938-39). Notably, "[t]his process would not preclude the water district(s) from taking any action they deem appropriate." (A-2934).

Once confirmed, treatment is deemed necessary, and it is incumbent upon NG and Navy to commence negotiations for funding of treatment with the affected water

---

[30] With NYSDEC specifically creating separate mechanisms for groundwater remediation and public water supply issues arising from site-related groundwater contamination, the district court's criticisms of the Town's alleged "shortcomings" regarding the requirements of the NCP (A-10527-28) are unwarranted.

district. That process is further documented in the Navy ROD, which specifically states that, "[i]f triggered, this will alert *the Navy to begin discussions with the appropriate water district* regarding various treatment alternatives." (A-2837) (emphasis added). That never occurred in this case.

Once the trigger value for site-related Freon-113 was confirmed in BPOW 4-1 in July 2012, NG and Navy were obligated to commence negotiations with the Town to discuss the treatment to protect Well 13 from the advancement of the OU-2 Plume. Yet, that did not occur (A-2938; A-2987; A-3006-07; A-4036-37; A-4060-61).

By November 2013, NG and Navy knew that: site-related Freon-113 had been confirmed in outpost MW BPOW 4-1; the Wells had detections of site-related VOCs; D&B had been retained to plan and design wellhead treatment for the Wells; and NYSDEC had notified the Town to provide the design reports for treatment to DOH for review with a copy to NYSDEC, yet NG and Navy failed to communicate with the Town regarding the appropriate treatment and funding for such treatment (A-2336-37; A-2422-24; A-4054; A-4060). As a result, the Town was permitted to move forward in the design of the treatment for the Wells (A-2934).

As requested by NYSDEC, the design reports were submitted to NCDOH, acting on behalf of NYSDOH, with a copy provided to NYSDEC (A-2425-2503; A-4035; A-4069-70). NCDOH conducted the review process of the design reports on

53

behalf of NYSDOH (A-4069-70). During that process, the Town attempted to engage NG and Navy, but to no avail (A-2347-48; A-2512; A-4072-74). Navy received and reviewed the design reports but opted not to respond or make any comments on the design or estimated cost of the PTAS treatment systems (A-3007-09). Neither did NG (A-2987). Instead of negotiating the funding for the removal of site-related VOCs from the Wells, Navy refused and raised the "other source" argument (A-2349-51; A-4037-41; A-4072-76). All the while, the Wells were removed from service at various times to ensure that they would not violate drinking water quality standards.

Thereafter, NCDOH approved, on behalf of NYSDOH, the PTAS with vapor phase GAC off-gas systems to treat the VOCs from the Wells (A-2359-64; A-4076-80). The approvals were under the supervision of NYSDOH and, "Issued For The State Commissioner Of Health." (A-2361; A-2364). NYSDEC and NYSDOH were notified and provided copies of the approval certificates (A-2360; A-2363).[31]

The OU-2 ROD and Navy ROD were both issued in consultation with the NYSDEC and NYSDOH, with NYSDOH the state agency responsible for regulating

---

[31] The treatment systems were constructed in accordance with the design reports, put in operation in accordance with the approvals issued under the authority of the NYSDOH, and remain in operation to treat the drinking water supplied by the Wells (A-4080-81).

drinking water in New York (A-2604; A-2834).[32]  As NYSDOH and NCDOH, in consultation with NYSDEC, had oversight and approval of the design and implementation of the treatment systems for the Wells, the Town's response action was approved by the requisite state agencies.  The Town's response actions were in accordance with the OU-2 ROD, the Navy ROD, and the PWSCP, were necessitated by NG and the Navy's failure to engage in negotiations with the Town to provide funding for the treatment systems for the Wells, and, therefore, satisfy the requirement of consistency with the NCP.  *See Niagara Mohawk*, 596 F.3d at 137.

In addition, the question of whether a response action is necessary and consistent with the NCP is a factual one to be determined at the damages stage of a section 107(a) action.  *Cadillac Fairview v. Dow Chem. Co*., 840 F.2d 691, 695 (9th Cir. 1988); *Hempstead v. United States*, 2017 U.S. Dist. LEXIS 237849 *36 (E.D.N.Y Sept. 18, 2017) (Judge Bianco noted that, "[w]hether plaintiff's actions comply with the NCP is an issue of fact.") (internal citations omitted).  There is a direct nexus between the costs incurred by the Town and the actual effort to remove the VOC contamination from the Wells.

---

[32] The analysis also applies to the Hooker/Ruco OU-3 ROD, which recognizes a coordinated groundwater investigation with the NG Site and NWIRP Site (A-5299-5300).

The PTAS treatment systems were determined by the Town's water supply engineering consultant to be appropriate (and recognized by NYSDEC and NG as the most-commonly used wellhead treatment systems)[33]; those systems were approved by the appropriate regulatory agencies; and those systems have allowed the Town to providing drinking water to its residents in compliance with applicable standards (A-4019-20; A-4051-52; A-9595-98).

The district court erred in concluding that the treatment systems were overdesigned with an "aggressive threshold" to treat 420 ug/l of TCE (A-10527). The Town demonstrated that: (i) the parameters of the PTAS systems properly considered the potential maximum influent concentration of the VOCs in the OU-2 Plume, supported by the data for the MWs showing TCE concentrations in nearby MWs in excess of 400 ppb, with the anticipated trend that TCE would reach the Wells, as evidenced by the low level concentrations being detected on outpost MW BPOW 4-2; and (ii) the NCDOH, on authority of the NYSDOH, accepted and approved the treatment systems with the influent parameters contained therein, including concentrations to treat Freon-113, PCE, TCE, and 1,1-DCA in amounts likely to impact the Wells (A-2359-61; A-2362-64; A-3624; A-4056-59; A-4063-

---

[33](A-2106; A-2667).

65).[34] The Town faced an actual, not theoretical, threat and took action necessary and consistent to ensure the removal of the site-related VOCs from the Wells.[35]

The Town has demonstrated that its response costs incurred for treatment of the Wells were necessary and consistent with the NCP or, at a minimum, that genuine questions of material fact exist as to whether the response costs were necessary and consistent with the NCP. Thus, the district court's determination that the Town did not comply with the NCP was erroneous and should be reversed and vacated.[36]

_____

[34] Any issue concerning aesthetics of the PTAS system as to Wells 7A/8A (A-182) has been refuted by the Town or, at a minimum, the Town has demonstrated genuine issues of material fact for trial (A-2504-07; A-3350-51; A-3700-05; A-3720; A-4068).

[35] As there is no evidence regarding the alleged overdesign as to treatment for Well 13 (A-5219-20), issues concerning consistency with the NCP related to Well 13 should, at a minimum, have been allowed to proceed to trial.

[36] If this Court determines that summary judgment dismissing the §107(a) claim should have been denied, then the §113(g) claim, seeking declaratory judgment for future response costs, should be reinstated for the same reasons as the §107(a) claim. *Revitalizing Auto Cmtys. Envtl. Response Trust v. Nat'l Grid USA*, 10 F.4th 87, 100 n.10 (2d Cir. 2021).

57

## POINT IV

## THE DISTRICT COURT ABUSED ITS DISCRETION IN EXERCISING SUPPLEMENTAL JURISDICTION AND DISMISSING THE STATE-LAW CLAIMS WITH PREJUDICE

The only issues before the district court were the Phase I CERCLA claims. The Defendants sought permission to move for summary judgment only as to the CERCLA claims.[37] The district court only permitted Defendants to move for partial summary judgment on the CERCLA claims. The notices of motion did not seek dismissal of the state-law claims.[38] Yet, NG and Occidental "seek to leverage" the facts supporting dismissal of the CERCLA claims to "similarly defeat" the state-law claims (A-10530). While acknowledging that, "as the Town correctly notes, the Phase II claims are not formally presented for consideration on these motions," the district court, nonetheless, opted to dismiss the state-law claims, finding that the failure to connect the Freon-113 in the Wells to the Sites required dismissal of those claims as well (A-10531). The district court abused its discretion in dismissing the state-law claims.[39]

---

[37] Docket Numbers 133-136.

[38] (A-149-50; A-198-99; A-5281-82; A-9862-63).

[39] If this Court finds that the Town demonstrated genuine issues of material fact in dispute for trial with respect to the CERCLA claims, then the dismissal of the state-law claims should be reversed and vacated for the same reasons.

58

In *AmBase Corp. v. 111 West 57th Sponsor LLC*, 785 Fed. App'x. 886, 889 (2d Cir. 2019), this Court vacated the dismissal of the state-law claims, in part, "because the district court gave no prior indication that it was considering dismissal, AmBase had no notice or opportunity to be heard on the issue." Here, since: (i) discovery of those Phase II claims had been stayed, (ii) the Defendants were only given permission to move for partial summary judgment on the CERCLA claims, and (iii) the district court gave no prior indication that it was considering entertaining any defendant's request seeking to "leverage the facts" for the dismissal of the state-law claims, the Town had no notice or opportunity to sufficiently brief those issues in connection with the Phase I motions.

In addition, the district court abused its discretion in exercising supplemental jurisdiction and dismissing the state-law claims with prejudice. A district court "may decline to exercise supplemental jurisdiction" if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. §1367(c)(3). Once "a district court's discretion is triggered under §1367(c)(3), it balances the traditional 'values of judicial economy, convenience, fairness, and comity,' in deciding whether to exercise jurisdiction." *Kolari*, 455 F.3d at 122 (internal citation omitted). In weighing those factors, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors. . .will point toward declining to

59

exercise jurisdiction over the remaining state-law claims." *Id*. (internal citation omitted).

In *ABB Indus. Sys. v. Prime Tech.*, 120 F.3d 351, 357 (2d Cir. 1997) cited by the district court (A-10531), the dismissal of the negligence claims was premised on the fact that defendants were not responsible parties who controlled the site at the time of disposal of the hazardous substances under CERCLA. The dismissal of all the claims in *ABB Indus. Sys.* were based on defendants' status which is not the case here.

The district court abused its discretion in concluding that the dismissal of the CERCLA claims also warranted dismissal of the state-law claims on the issue of causation. In a trespass claim, the appropriate standard for determining the intent to invade another's property is whether the defendant intended the act and had good reason to know or expect, "that subterranean and other conditions were such that there would be passage [of the contaminated water] from defendant's to plaintiff's land." *Scribner v. Summers*, 84 F.3d 554, 558 (2d Cir. 1996) (internal citation omitted) (brackets in original).

In cases involving pollution of underground waters, a claim of negligence may be founded if the defendant, "failed to exercise due care in conducting the allegedly polluting activity," (*Benoit v. Saint-Gobain Performances Plastics Corp.*, 959 F.3d 491, 502 (2d Cir. 2020) (internal citation omitted)), with knowledge "such conduct

could result in the contamination of the plaintiff's well." (*Fetter v. DeCamp*, 195 A.D.2d 771, 773 (3rd Dep't 1993)). In addition, the "seepage of chemical wastes into a public water supply constitutes a public nuisance." *Benoit*, 959 F.3d at 505 (internal citation omitted).

Here, NG's actions in releasing hazardous substances at the NG Site and NWIRP Site over many decades have been found to be intended. *See Travelers I*, 3 F. Supp.3d at 105 ("the relevant question is whether the act of discharge or disposal was intended, and it was"). That same determination applies to all Defendants. Defendants had good reason to know or expect that there would be passage of the VOC contamination released at the Sites to the Wells based, in part, on the groundwater modeling performed as part of the PWSCP to determine to install outpost MWs to provide early warning of the advancement of the OU-2 Plume to Well 13.

Thus, based on New York state law cited above, the causation standard for a state law negligence, nuisance or trespass claim is different than the analysis of a CERCLA claim. Moreover, to the extent that this Court adopts a new standard applicable to two-site CERCLA cases, it should be left to the New York Courts to decide whether such a standard is applicable to common law cases brought to protect the public water supply. In addition, if this Court finds that the Town has satisfied its *prima facie* burden as to the CERCLA claims, but finds that the Town failed to

61

substantially comply with the NCP, the state-law claims are not subject to the requirements of the NCP. As such, those claims should be allowed to proceed either in the district court or should be dismissed without prejudice.

## CONCLUSION

This Court should reverse and vacate the Order and Judgment and remand for further proceedings or remand for entry of a revised order dismissing the state-law claims without prejudice.

Dated:  August 1, 2025
       Garden City, New York

Respectfully submitted,

JASPAN SCHLESINGER NARENDRAN LLP
Attorneys for Plaintiff-Appellant

/s/ Scott B. Fisher

By: _____
SCOTT B. FISHER
300 Garden City Plaza, 5th Floor
Garden City, New York 11530
(516) 746-8000 ext. 248

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B), the word limit of Local Rule 32.1(a)(4) (A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 13,910 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman.

Dated:  New York, New York
        August 1, 2025

**SPECIAL APPENDIX**

i

**SPECIAL APPENDIX TABLE OF CONTENTS**

                                                             **Page**

Memorandum and Order of the Honorable Eric N.
    Vitaliano, dated and filed February 16, 2025,
    Appealed From ......................................................    SPA-1

Judgment of the United States District Court for the
    Eastern District of New York, dated and filed
    February 26, 2025, Appealed From ......................    SPA-28

SPA-1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
TOWN OF HEMPSTEAD,                                           :
                                                            :
                                           Plaintiff,       :
                                                            :        MEMORANDUM & ORDER
                              -against-                      :
                                                            :        2:16-CV-3652 (ENV) (ST)
                                                            :
UNITED STATES OF AMERICA, et al.,                           :
                                                            :
                                          Defendants.        x
------------------------------------------------------------
VITALIANO, D.J.

Plaintiff Town of Hempstead ("Hempstead" or "the Town") brings this lawsuit against defendants the United States of America and the Department of Navy (together, the "federal defendants"), Northrup Grumman Corporation ("Northrop"), the Occidental Chemical Company ("Occidental"), and Covestro LLC and the Bayer Corporation (together, the "Covestro defendants") making claims arising under the Comprehensive Environmental Response Compensation and Liability Act ("CERLCA"), 42 U.S.C. § 9601 *et seq.*, and asserting New York common law actions sounding in nuisance, trespass, and negligence. The Town alleges that its Levittown Water District ("LWD") Wells 7A, 8A, and 13 were contaminated by groundwater emanating from the former Naval Weapons Industrial Reserve Plant; the former Northup Grumman Facility; and/or the former Hooker Chemical/Ruco Polymer Property, and seeks costs that it expended in responding to the contamination of its wells.

Presently before the Court are summary judgment motions separately filed by the federal defendants (Dkt. No. 163), Northrup (Dkt. No. 162), Occidental (Dkt. No. 180), and the Covestro defendants (Dkt No. 198). For the reasons that follow, these motions are granted in their entirety.

1

SPA-2

<u>Background</u>[1]

From the early 1940's to 1996, the federal defendants owned, and co-defendant Northrop and its predecessors operated, a Naval Weapons Industrial Reserve Plant located on over 100 acres of property in Bethpage, New York (the "NWIRP Site"). Fed. Defs.' Rule 56.1 Stmt., Dkt. No. 164, ¶ 1. The Site is contiguous to approximately 500 acres of property owned and operated by Northrop (the "Northrop Site"). *Id.* ¶ 2. To say that the public controversy and litigation slate underlying these sites was well-chalked by the time this lawsuit commenced would be an understatement.

During the manufacturing process at the NWIRP Site, Northrop used solvents containing volatile organic compounds ("VOCs"). Northrup Rule 56.1 Stmt., Dkt. No. 170, ¶ 4. Beginning in 1983, when the New York State Department of Environmental Conservation ("DEC") listed the NWIRP Site in the Registry of Inactive Hazardous Waste Disposal Sites, DEC has supervised investigation and remediation of the site, including off-site contamination. *Id.* ¶ 6. In 1997, Northrop installed an on-Site containment system ("ONCT") to treat and remove VOC contaminants from the groundwater. *Id.* ¶ 9. DEC subsequently issued a Record of Decision for the Operable Unit 2 groundwater plume associated with the NWIRP Site (the "OU2 ROD"), selecting the ONCT as part of its chosen remedy. *Id.* ¶¶ 9–10. The OU2 ROD assessed that the "[a]ctual or threatened release of hazardous waste constituents from this site, if not addressed by implementing the response action selected in this ROD, presents a current or potential significant

---

[1] The facts are drawn from the affidavits, exhibits, Rule 56.1 statements, and counterstatements of fact submitted by the parties. Factual disputes are noted. Where facts are disputed, "the sources for the claims made in dueling Rule 56.1 Statements" are considered directly. *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 396 (S.D.N.Y. 2015). Citations to pages of the parties' briefing refer to the Electronic Case Filing System ("ECF") pagination, except that citations to a deposition reference the internal document's pagination.

SPA-3

threat to public health and the environment." Miller Decl., Ex. 2 (OU2 ROD), Dkt. No. 179-2, at 3.

The OU2 ROD also mandated the implementation of a Public Water Supply Contingency Program ("PWSCP") to address hazardous substances in the OU2 plume that might impact public water supplies. Northrop Rule 56.1 Stmt. ¶ 11. The PWSCP, which Northrop, the Navy, and the Town are parties to, provides for (1) groundwater modeling, which estimates the future migration of the OU2 Plume thirty years into the future; (2) outpost monitoring wells, which monitor the groundwater plume anticipated to impact public water supply wells; (3) establishment of trigger values for certain hazardous substances, which, if reached at an outpost well, would require the relevant water district to be notified; and (4) a process whereby potentially impacted water suppliers, like the Town, can negotiate with the Navy and Northrop for the design and construction of appropriate wellhead treatment or comparable alternative measures if trigger values are reached. *Id.* ¶ 16.

Hempstead operates 15 public supply wells in the Levittown Water District to the southwest of the NWIRP Site that provides potable water to customers in residential areas. *Id.* ¶ 25. It alleges that three of its wells—LWD Wells 7A, 8A, and 13 (the "LWD Wells")—were impacted by the chemical Freon-113 originating from commingled groundwater from the NWIRP and Northrup Sites, forcing the Town to incur millions of dollars in response costs. *Id.* ¶ 27; Compl., Dkt. No. 1, ¶ 26. LWD Wells 7A and 8A are situated in the same well field about 100 feet apart, and LWD Well 13 is located approximately one-half mile away from LWD Wells 7A and 8A. Pl. Rule 56.1 Stmt., Dkt. No. 169, ¶¶ 6, 9. Hempstead first became aware of the potential impact to the LWD Wells in July 2012, when Northrop's environmental consultant, consistent with the PWSCP, informed the Town that samples collected from outpost monitoring wells for

3

LWD Well 13 showed Freon-113 meeting the trigger value of 1.5 μg/l.[2]  Northrup Rule 56.1 Stmt. ¶¶ 30–32.

Shortly thereafter, in April 2013, the Town retained engineering consultants Dviroka & Bartilucci Engineers & Architects, P.C. ("D&B") to determine the necessary treatment for removal of Freon-113 from the LWD Wells.  *Id.* ¶¶ 33–34; Pl. Rule 56.1 Stmt. Response, Dkt. No. 168, at 7.  D&B completed design reports for its chosen wellhead remedy, Packed Tower Aeration Systems ("PTAS"), in August 2014.[3]  Northrup Rule 56.1 Stmt. ¶ 37.  Although the PWSCP set forth a process for Hempstead to follow if it intended to seek reimbursement from the federal defendants and Northrup for its treatment of impacted wells, including negotiating the design and payment of such treatment *ex ante*, the Town unilaterally began construction of its PTAS treatment without consulting the parties and without a financial agreement in place.  *Id.* ¶¶ 36–42.

Taking the next step, on April 24, 2015, a consultant for D&B sent the Navy a letter by Hempstead's fiat (the "April 2015 Letter") attaching the already Town-approved design reports for the treatment systems and stating: that construction on the Well 13 system had already commenced; that construction on the Well 7A/8A system would commence soon; and requesting payment of the Town's costs "in accordance with the PWSCSP."  *Id.* ¶¶ 38, 41–42.  With respect to LWD Wells 7A and 8A, the April 2015 Letter stated that the wells had not been "specifically identified in the PWSCP," but "given their proximity to the westerly boundary of the plume, it appears they have been impacted."  *Id.* ¶ 43

The Navy responded to the Town's letter on June 18, 2015, requesting additional information and data supporting the letter's claim that the Freon-113 in the LWD Wells originated

---

[2] The Freon-113 detections were 1.5, 2.1, and 1.9 μg/l.  Northrop Rule 56.1 Stmt. ¶ 30.

[3] A packed tower aeration system is a commonly used treatment system that reduces the presence of contaminants in water.  Northrop Rule 56.1 Stmt. ¶ 98.

from the NWIRP Site and that the Freon-113 concentration necessitated wellhead treatment. Northrop Rule 56.1 Stmt. ¶¶ 46–48. In lieu of responding to the Navy's letter, the Town filed this lawsuit on June 30, 2016, also naming as defendants Occidental and the Covestro defendants, prior owners and operators of the Hooker-Ruco Site, a 14-acre, triangular-shaped parcel of land located approximately three miles north, northeast of the LWD Wells. *Id.* ¶¶ 50, 53; Occidental Rule 56.1 Stmt., Dkt. No. 180-24, ¶ 24; Occidental Mot., Dkt. No. 180-23, at 9. Hempstead alleges that the "disposal and release of hazardous substances" from the Hooker-Ruco Site "caused ground water contamination which has commingled with the downgradient groundwater contamination emanating from the NWIRP/Northrup Grumman Site." Compl. ¶ 3. According to the Town's Water Commissioner, Occidental and the Covestro defendants were included in the lawsuit because they were identified by the Town as registered hazardous waste site owners and/or generators of hazardous wastes. Covestro Rule 56.1 Stmt., Dkt. No. 198-15, ¶ 17.

The Hooker-Ruco Site had not flown under the radar while the NWIRP Site was the subject of environmental enforcement scrutiny. The United States Environmental Protection Agency ("EPA") placed it on the National Priorities List under CERCLA in or about 1986 and has since overseen a remedial plan for the off-site groundwater impacts from its groundwater plume (the "Hooker-Ruco Site Sub-Plume"). Occidental Rule 56.1 Stmt. ¶¶ 2–3. In coordination with EPA and DEC, Occidental studied and selected a treatment that increased the concentration of oxygen in the Hooker-Ruco Site Sub-Plume to degrade the concentrations of volatile compounds, and later that year EPA issued a ROD approving the selected remedy (the "OU3 ROD"). *Id.* ¶¶ 8–10. Under the OU3 ROD, residual levels of any volatile organic compound associated with the Hooker-Ruco Site Sub-Plume that have not naturally degraded from the oxygen treatment are captured and treated by a remedial system operated by Northrup under DEC oversight. *Id.* ¶ 11. In 2016 and

5

SPA-6

again in 2021, EPA concluded that the approved oxygen treatment effectively treats groundwater contamination at the Hooker-Ruco Site and that no modification to treatment is required. *Id.* ¶¶ 17, 20.

Reasserting its aggressive litigation posture, Hempstead did not notify Occidental or the Covestro defendants prior to designing and constructing the PTAS for Wells 7A/8A and 13, nor did the Town request that EPA modify the remedy for the Hooker-Ruco Site Sub-Plume to include any treatment facilities at the LWD Wells. *Id.* ¶¶ 32–33. In any event, Hempstead brought claims against Occidental and the Covestro defendants, alleging that "contaminated groundwater emanating from the Hooker/Ruco site . . . is commingled with the groundwater plume emanating from the NWIRP/Northrup Grumman Site which," the Town claims, was impacting its wells. Compl. ¶ 51.

A little more than five months after Hempstead brought suit, on December 2, 2016, the defendants separately moved to dismiss the complaint. *See* Dkt. Nos. 51, 54, 55, 59. On September 18, 2017, the Honorable Joseph F. Bianco, then a judge of this court and now a judge of the United States Court of Appeals for the Second Circuit, denied the motions in their entirety, except the court dismissed the Town's private nuisance claim against the Covestro defendants and the federal defendants. *See* Dkt. No. 77. The Court also divided the case into two phases. *See* Dkt. No. 92. Phase I addresses the Town's CERCLA claims, and Phase II addresses the Town's common law claims. Discovery on the Phase II claims was stayed pending briefing on the motions for summary judgment. *See* Dkt. No. 113. On December 6, 2021, all defendants moved for summary judgment, seeking dismissal of the Town's Phase I CERCLA claims. *See* Dkt. Nos. 162, 163, 180, 198. Although no defendants sought dismissal directly on the Phase II common law claims, Northrup and Occidental argued that dismissal of the CERCLA claims would compel

dismissal of the common law claims as well, thus bringing the case to judgment and closure of the docket.

Legal Standards

A.     Summary Judgment

Summary judgment shall be granted in the absence of a genuine dispute as to any material fact and upon a showing that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). "[A] fact is material if it 'might affect the outcome of the suit under the governing law.'" *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene of N.Y.*, 746 F.3d 538, 544 (2d Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986)). A dispute over material facts is "genuine" where "a reasonable jury could return a verdict for the nonmoving party" based on the evidence cited. *Anderson*, 477 U.S. at 248. In determining whether genuine issues of fact exist, "'the district court may not properly consider the record in piecemeal fashion, trusting innocent explanations for individual strands of evidence.'" *Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 227 (2d Cir. 2024) (quoting *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 45 (2d Cir. 2019)).

Assertions of fact made in connection with a motion for summary judgment must be supported by citations "to particular parts of materials in the record" that could be presented as admissible in evidence, which may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A), (c)(2); *Lyons v. Lancer Ins. Co.*, 681 F.3d 50, 57 (2d Cir. 2012). "Before summary judgment may be entered, the district court must ensure that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden

SPA-8

of production even if the statement is unopposed." *Jackson v. Fed. Express*, 766 F.3d 189, 194 (2d Cir. 2014). With that standard in mind, the Court's job at this stage is not to try the facts but instead to merely "determine whether there are issues of fact to be tried." *Sutera v. Schering Corp.*, 73 F.3d 13, 16 (2d Cir. 1995) (citing *Katz v. Goodyear Tire & Rubber Co.*, 737 F.2d 238, 244 (2d Cir. 1984)).

The movant carries the burden of demonstrating that there is no genuine dispute as to any material fact, *see Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005), and the Court will resolve all ambiguities and draw all permissible factual inferences in the light most favorable to the party opposing the motion. *See Reese v. Triborough Bridge & Tunnel Auth.*, 91 F.4th 582, 589 (2d Cir. 2024). Where the nonmoving party "will bear the burden of proof at trial," it bears the initial procedural burden at summary judgment of demonstrating that undisputed facts "establish the existence of [each] element essential to that party's case[.]" *Celotex Corp.*, 477 U.S. at 322–23. "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 33 (2d Cir. 1997).

Since the controlling rule of civil procedure is the same, the standard for granting summary judgment in CERCLA cases is not different from other cases. *B.F. Goodrich Co. v. Betkoski*, 99 F.3d 505, 521 (2d Cir. 1996), *reh'g. denied*, 112 F.3d 88 (1997). At the same time, given the types of facts and issues presented in such cases, the Second Circuit has recognized that, in CERCLA cases, summary judgment "is a 'powerful legal tool' that 'can avoid lengthy and perhaps needless litigation.'" *B.F. Goodrich Co.*, 99 F.3d at 514 (quoting *U.S. v. Alcan Aluminum Corp.*, 990 F.2d 711, 720 (2d Cir. 1993)).

SPA-9

B.    CERCLA Statutory Scheme

CERCLA was designed to "'assur[e] that those responsible for any damage, environmental harm, or injury from chemical poisons bear the costs of their actions.'" *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 120 (2d Cir. 2010) (quoting S. Rep. No. 96–848, at 13 (1980)). "Because it is a remedial statute, CERCLA must be construed liberally to effectuate its two primary goals: (1) enabling [] EPA to respond efficiently and expeditiously to toxic spills, and (2) holding those parties responsible for the releases liable for the costs of the cleanup." *B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1198 (2d Cir. 1992).

Under CERCLA, "property owners are strictly liable for the hazardous materials on their property, regardless of whether or not they deposited them there." *Niagara Mohawk*, 596 F.3d at 120. But CERCLA leaves room for the chancellor's boot. The statute allows property owners "to seek reimbursement of their cleanup costs . . . from certain polluters," also known as "potentially responsible parties ('PRPs')." *Id.* (quoting 42 U.S.C. § 9607(a)). CERCLA Section 107 "authorizes the United States, a state, or 'any other person' to seek reimbursement for all removal or remedial costs associated with the hazardous materials on the property, provided that those actions are consistent with the National Contingency Plan—the federal government's roadmap for responding to the release of hazardous substances." *Id.* at 120–21 (citing 42 U.S.C. § 9607(a)(4)).

"A *prima facie* cause of action under CERCLA requires a plaintiff to establish: (1) defendant fits one of the four classes of responsible parties outlined in § 9607(a); (2) the site is a facility; (3) there is a release or threatened release of hazardous substances at the facility; (4) the plaintiff incurred costs responding to the release or threatened release; and (5) the costs and response actions conform to the National Contingency Plan." *B.F. Goodrich*, 958 F.2d at 1198 (citing *State of New York v. Shore Realty Corp.*, 759 F.2d 1032, 1043 (2d Cir. 1985)).

9

Discussion

Putting the pre-lawsuit position-taking into a real-world context, Hempstead seeks to recover the approximately $8.4 million in response costs for its construction of the wellhead treatment system for the LWD Wells under CERCLA Section 107. Defendants seek summary judgment, arguing that dismissal is proper because Hempstead has failed to establish two elements of its *prima facie* case: *first*, defendants contend that releases from their respective sites—the NWIRP Site for the federal defendants and Northrup and the Hooker-Ruco Site for Occidental and the Covestro defendants—did not cause the Town to incur response costs; and *second*, even if the causation element were met, the Town's costs were neither necessary nor consistent with the National Contingency Plan. In a foundational retort, Hempstead contends that, material facts being in dispute, summary judgment on these claims is barred.

The general principles guiding CERCLA liability determinations are well-established. There is, of course, the critical requirement that a CERCLA plaintiff make a showing of casualty. Plaintiffs seeking to impose liability under CERCLA must demonstrate a causal connection between a release or threatened release and its incurrence of response costs. *See Freeman v. Glaxo Wellcome, Inc.*, 189 F.3d 160, 163 (2d Cir. 1999); *New York v. Next Millenium Realty, LLC*, 160 F. Supp. 3d 485, 504 (E.D.N.Y. 2016).[4] But, that does not mean that the applicable liability rules are one size fits all.

---

[4] The Town incorrectly contends that CERCLA § 107(a)'s causation requirement applies only to arranger liability. *See* Pl. Opp. to Fed. Defs. Mot. ("Pl. Fed. Opp."), Dkt. No. 167, at 18–19. In fact, the Second Circuit has not limited the causal requirement to arranger liability because that would be contrary to the statute. *See ABB Indus. Sys., Inc. v. Prime Tech., Inc.*, 120 F.3d 351, 356 (2d Cir. 1997) (requiring plaintiff to show that it "incurred costs *in response to* the release or threatened release); *see also Artesian Water Co. v. Gov't of New Castle Cty.*, 269 F. Supp. 1269, 1282 (D. Del. 1987), *aff'd* 851 F.2d 643 (3d Cir. 1988) ("CERCLA's strict liability scheme does not diminish the necessity of demonstrating a causal connection between a release or threatened release and the incurrence of costs by a section 107 plaintiff.") (citing *Shore Realty Corp.*, 759 F.2d at 1044 n. 17).

10

For example, CERCLA cases concerning two areas of potential contamination, a primary site and a secondary downgradient site, are referred to as "two-site" cases. *See New York v. Adamowicz*, 16 F. Supp. 3d 123, 140 (E.D.N.Y. 2014), *aff'd* 609 F. App'x 19 (2d Cir. 2015). While CERCLA is a strict liability statute—imposing liability on property owners for the hazardous materials on their property, regardless of whether they deposited them there—numerous circuit courts have determined that a different causation standard applies to plaintiffs seeking to recover in two-site cases; these plaintiffs must show a nexus between the release of contaminants on the primary site and the costs incurred on the downgradient site. *See, e.g.*, *Kalamazoo River Study Group v. Rockwell Int'l Corp.*, 171 F.3d 1065, 1068 (6th Cir. 1999) (in order to make out a *prima facie* case in a "two-site" case, a plaintiff "must establish a causal connection between the defendant's release of hazardous substances and the plaintiff's response costs incurred in cleaning them up."); *White v. County of Newberry*, 985 F.2d 168, 174–75 (4th Cir. 1993) (requiring plaintiffs to prove "a release or threatened release of a hazardous substance from the County's maintenance facility that caused the [plaintiff] to incur response costs"); *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 670 (5th Cir. 1989) ("the relevant factual inquiry should focus on whether the particular hazard justified any response actions.").[5]

Although it is clear from CERCLA litigation nationally that two-site cases present the need for a different approach to causality, the Second Circuit has not embraced a singular approach in such cases as binding precedent. But multiple district courts in this circuit have, however, required

---

[5] Plaintiff is mistaken to the extent it interprets CERCLA's strict liability statutory scheme as removing a causation requirement in two-site cases. *See* Pl. Fed. Opp. at 18. Projecting strict liability onto two-site cases would open the floodgates of liability by allowing any party who discovers groundwater contamination on its land to successfully sue every party who ever released the contaminant of concern on separate land. CERCLA is meant to be construed liberally, but it cannot countenance such an absurd result. Indeed, "finding that § 9607(a) imposes strict liability does not rebut [defendants'] causation argument," as "[t]raditional tort law has often imposed strict liability while recognizing a causation defense." *Shore Realty Corp.*, 759 F.2d at 1044 n. 17.

the showing of a nexus between the contamination at the downgradient site and a release at the primary site. *See, e.g.*, *Adamowicz*, 16 F. Supp. 3d at 141 (citing *Artesian Water Co.*, 659 F. Supp. at 1283) (a plaintiff must "show that the release at the Site was a substantial factor in incurring downgradient response actions."); *DVL, Inc. v. General Elec. Co.*, 811 F. Supp. 2d 579, 597 (N.D.N.Y. 2010) (a plaintiff must "provide [] evidence of a nexus between [] defendant's waste and the contamination at the [site]"); *Innis Arden Golf Club v. Pitney Bowes, Inc.*, 629 F. Supp. 2d 176, 185–187 (D. Conn. 2009) (finding "[s]upport" in "the text of § 107" for the principle that "plaintiff must establish a causal connection").  Given the persuasiveness of the argument for this approach, buttressed by the favor it has found among other district courts in this Circuit, the Court elects to follow these cases and recognize that plaintiffs in two-site cases must provide evidence that their cleanup costs were caused by the release of contaminants at the primary site.[6]

Notwithstanding the causation standard used to assess them, defendants' summary judgment motions require the parties to make a showing of facts relating to the hydrology of the affected land, the creation of contaminants, actual contamination, a need to respond, and the nature of any required remedial response.  The record evinces the intent of the parties to make such showings.  With respect to Hempstead's chief complaint that Freon-113 contaminated its wells, the federal defendants and Northrup point out that Freon-113 is a common groundwater contaminant, and evidence indicates there are sources of Freon-113 upgradient of the LWD Wells

---

[6] With *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112 (2d Cir. 2010) as its buckler, Hempstead presses its argument against this causation standard, contending that, in *Niagara Mohawk*, the Second Circuit "applied the same standard to a two-site case as it did to one-site cases." Pl. Fed. Opp. at 22–23.  But *Niagara Mohawk* is not to the contrary.  While the Second Circuit in *Niagara Mohawk* stated that the plaintiff need not "prove with certainty that a [] defendant discharged the hazardous material" in order to recover, 596 F.3d at 132, the defendant was only found liable "because there [was] evidence in the record that [defendant] may have deposited hazardous materials that settled" at plaintiff's site. 596 F.3d at 135.  Specifically, defendant's expert testified that hazardous materials left behind on plaintiff's property "originated at [defendant's] Plant." *Id.*  Thus, just like the two-site cases from other circuits, the Second Circuit only determined liability after looking favorably on direct evidence linking the release of hazardous materials from the primary site to the ultimate cleanup costs.

and west of the NWIRP Site that the Town's consultant did not consider in designing the treatment systems. *See* Northrup Rule 56.1 Stmt. ¶¶ 64, 87–89. In fact, the Town's water commissioner admitted at his deposition that, as of June 2015, the Town had no evidence that the alleged contamination in the LWD Wells emanated from the NWIRP Site, nor could the commissioner point to a specific report or document identifying the NWIRP Site as the source of contamination at the LWD Wells. *See* Schumacher Decl. Ex. H (Reinhardt Dep. Tr.), Dkt No. 166-8, at 76:7–13; 144:18–145:4. Indeed, the Town has not offered any such admissible report or document covering the period from 2015 to the submission of the summary judgment motions. More to the point, defendants highlight evidence from the Town's own expert that the NWIRP Site is not upgradient of the LWD Wells, as the current groundwater flows *southeast* and the LWD Wells are located *southwest* of the NWIRP Site. *See* Northrup Rule 56.1 Stmt. ¶ 73. Thus, defendants assert, "[i]t does not make hydrogeological sense that the LWD Wells would even be affected by the OU2 plume." Northrup Mot., Dkt. No. 162-1, at 27.

The marshalling of these facts by defendants requires a factual response in kind to establish the existence of a material fact dispute. Instead, the Town invites the Court to speculate. In essence, Hempstead asks the court to consider why an outpost monitoring well was placed by LWD Well 13, which suggests to Hempstead that the groundwater flows from the NWIRP Site to the LWD Wells in a southwesterly direction. Pl. Fed. Opp. at 30–31. But, as the federal defendants and Northrup make clear, the outpost monitoring well for LWD 13 was installed only as a "conservative measure," as modeling showed that LWD Well 13 would not be impacted by the OU2 plume within the 30-year evaluation period. *See* Northrup Rule 56.1 Stmt. ¶ 28. Moreover, the PWSCP itself, which the Town is a party to, states that the "regional groundwater flow direction" "is migrating generally to the south/southeast." Miller Decl. Ex. 6 (PWSCP), Dkt. No.

179-7, at 8. The Town's expert further speculates that the groundwater flow direction *may* have been different "decades ago," but notably does not even suggest that groundwater previously flowed in a southwesterly direction. *See* Miller Decl. Ex. 27 (H2M Expert Report), Dkt. No. 179-28, at 4. Since the current southeasterly flow of the groundwater is unchallenged, and in fact accepted by all parties, the Court agrees with Northrup and the federal defendants that the NWIRP Site could not have been the source of the Freon-113 in the LWD Wells.

The federal defendants' and Northrup's assault on causation does not end there, as their submission of plausibly uncontroverted facts and argument continue to jackhammer away at causality. For example, their submissions zero in on the virtual absence of the compound TCE—the predominant substance associated with the NWIRP Site, *see* Fed. Defs. Rule 56.1 Stmt. ¶ 105—in the LWD Wells, reasoning that "[i]f the Freon-113 in the LWD Wells came from the TCE-characterized OU2 plume, then TCE should also be present." Northrup Mot. at 26. The Town's groundwater modeling expert attempts to provide the missing link by presenting evidence that Freon-113 travels faster in groundwater than TCE, *see* Northrup Rule 56.1 Smt. ¶ 92, but defendants point out certain flaws in the expert's analysis that fatally undermine its reliability. For example, the expert admits that his opinion only applies to "pure" (*i.e.*, undissolved) forms of TCE and Freon-113, which do not exist in the OU2 plume. *See id.* ¶ 93. Further, the expert admitted at deposition that the two substances would travel at roughly the same rate of speed at the concentrations detected in the plume. *Id.* ¶ 94.[7] Also missing in his analysis is an explanation for

---

[7] The Town supports its opposition to the motions for summary judgment by filing a new expert declaration, which includes the opinion that Freon-113 travels at a faster pace in groundwater than TCE. *See Hazlett* Decl., Dkt. No. 175 ¶¶ 20–22. While an expert affidavit providing evidentiary details for an opinion expressed in an expert report may be considered in opposition to summary judgment, this declaration must be disregarded under the "Sham Affidavit" rule because it contradicts prior sworn testimony previously offered on behalf of the same party that the two substances would travel at the same rate of speed at the concentrations detected in the plume. *See Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987) ("It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment); *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) ("factual allegations that might otherwise defeat a motion for summary

why LWD is the only water district allegedly affected by the OU2 plume that had only Freon-113 present in its wells. *Id.* ¶ 77. The Town therefore cannot explain how, if the NWIRP Site was indeed the source of the contamination, no TCE was found in the LWD Wells.

The Town's affirmative theories of causation, as supported by its various experts, also break down under further scrutiny. *First*, the Town's "source" expert opines that there may be a distinct Freon-113 plume at the western boundary of the OU2 plume due to "voids" in the ONCT at the Site, *id.* ¶ 74, which purportedly explains the standalone Freon-113 samples in the LWD Wells. Yet the opinion does not attempt to explain, much less factually demonstrate, what caused the contamination; instead, the opinion is only a theory about how the contamination "might" have occurred. Tellingly, the "void" theory was not accepted by DEC when presented to them. *Id.* In fact, DEC determined that the ONCT has been effective and has never concluded that the ONCT has voids that would allow contaminants to migrate from on-site to off-site. *Id.* ¶ 12. *Second*, the Town's expert on groundwater modeling performed a "capture zone" analysis, showing that the area from which the LWD Wells draw water overlaps with the OU2 plume. *Id.* ¶ 95. But the expert admitted that his "capture zone" analysis does not model contaminant fate and transport, *see id.* ¶ 96, meaning his analysis does not assist in answering the central inquiry of where the Freon-113 found in the LWD Wells originated. Nor does the "capture zone" analysis, according to the expert, rule out non-NWIRP Site sources of the Freon-113 in the LWD Wells. *Id.* ¶ 97

Given the discussed flaws in the "void" and "capture" theories of causation, Hempstead is left to rely on proximity alone: In the Town's telling, that the NWIRP Site is located near the LWD Wells and Freon-113 has been detected in both the LWD Wells and the OU2 plume is

_____

judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts her own prior deposition testimony"). The same rule holds true when a party offers an expert declaration in opposition to a motion for summary judgment that contradicts the expert's original sworn opinion. *See Clark v. Quiros*, 693 F. Supp. 3d 254, 283 (D. Conn. 2023).

enough to create an issue of fact regarding source. But the holding in *DVL, Inc. v. General Electric Company* instructs that summary judgment is proper where, as here, plaintiff's only explanation for causation is proximity. 811 F. Supp. 2d at 597. In *DVL*, the court found the plaintiff's evidence insufficient to establish a causal link where "DVL's CERCLA claim against GE appears to rest largely on the fact that GE owns the property adjacent to the DVL Site; the soil in that property is PCB-contaminated; . . . [and] the PCBs contaminating the subject property match those used at GE's Fort Edwards Site." *DVL*, 811 F. Supp. 2d at 597–98. The *DVL* court also noted that "DVL offers no evidence that the deposits on GE's land made their way down to the DVL Site," *id.* at 599, which is similar to the Town's inability to produce evidence that deposits from defendants' land made its way to the LWD Wells. Just like the plaintiff in *DVL*, the Town needs to present more than evidence of spatial proximity to show causation and survive the motions for summary judgment. Because plaintiff fails to do so, the federal defendants and Northrup's motions for summary judgment must be granted.

Hempstead's failure to make a showing of causality essential to carrying the proof burden CERCLA § 107 demands is, if anything, starker with respect to the claims it interposes against Occidental and the Covestro defendants. To begin with, Freon-113 was not identified as part of the manufacturing process at the Hooker-Ruco Site, was not identified as a contaminant of concern for the Hooker-Ruco Site, and was not detected in the groundwater underlying or emanating from the Hooker-Ruco Site. *See* Johnson Decl. Ex. C (Johnson Report), Dkt. No. 180-22, at 5, 15, 29–31. Moreover, the primary contaminant of concern defining the Hooker-Ruco Sub-Plume, VCM, was not found in the LWD Wells, *see id.* at 6, 29, and the Town does not explain how Freon-113 could have migrated to the LWD Wells in the absence of VCM. Finally, and most damaging to the Town's theory of causation, Occidental's expert report, to which no competent retort is offered,

explains that the rate at which groundwater in the area generally moves is too slow for substances emanating at the Hooker-Ruco Site to have migrated the 15,000 feet to the LWD Wells in the relevant time period. *See id.* at 20, 30; *Kalamazoo River*, 171 F.3d at 1069–1073 (affirming grant of summary judgment to defendant who demonstrated lack of necessary causal link by submitting expert evidence that contaminants from the upgradient site did not reach the downgradient one).[8]

Teetering from the start, bumped by the admission by the Town's Water Commissioner that he was unaware of any factual basis which could support a finding that the Hooker-Ruco Site may have been the source of the Freon-113 found in the LWD Wells, *see* Covestro defendants Rule 56.1 Stmt. ¶¶ 15–16, Hempstead argues that Freon-113 was "used and likely discharged at the Hooker-Ruco Site and likely migrated off-site and commingled with the OU2 plume," and the commingled plume impacted its wells. *See* Pl. Opp. to Occidental Mot. ("Pl. Occ. Opp."), Dkt. No. 180-26, at 18, 22–28. Struggling to find something beyond sheer speculation to support its argument, the Town rests on three disparate and obscure references to Freon-113 dating back almost 50 years, but these references—which at most show that Freon-113 existed at the Hooker-Ruco Site—fail to create a dispute about any material fact, even when considered collectively with the Town's other evidence.

The first reference is hidden in a 1977 "Raw Materials Requirement" list, which included Freon-113 as one of the chemicals purchased for use at the Hooker-Ruco Site for the calendar year 1974. But Hempstead offers no proof as to what, if any, use Occidental or the Covestro defendants made of the substance at the Site, nor does it offer any evidence to distance itself from a document that answers the question: a 1979 Occidental interoffice memorandum showing that Freon-113

---

[8] Hempstead disputes the distance, as calculated by the defense expert, between the Hooker-Ruco Site and the Wells, *see* Pl. Rule 56.1 Response, Dkt. No. 180-28, ¶ 24, but the expert report, which, on this point, is not plausibly disputed, makes clear that the rate at which groundwater moves was too slow to even travel the lesser distance claimed by the Town. *See* Johnson Report at 20.

17

was neither used, manufactured, nor discharged at the Hooker-Ruco Site.  *See* McDonald Decl. Ex. A (1979 Memo), Dkt. No. 180-158 at 3.  The Town next offers groundwater and soil sampling from the Hooker-Ruco Site in 1989 and 1990 which purports to show the inclusion of Freon-113, but the record reveals that these samples were rejected because the "blanks"—*i.e.*, separate samples used as control groups—also revealed the presence of Freon-113, indicating test invalidity and neutering its evidentiary relevance.  *See* Johnson Decl., Ex. C at 16.  In its final effort to connect the Hooker-Ruco Site to its response costs, the Town points to an appendix to the 2005 Final Design Report that Occidental submitted to EPA for approval of its oxygen treatment system; the appendix contains a list of chemical compounds previously detected in soils and groundwater "at and in the vicinity of the Hooker-Ruco Site," including Freon-113.  *See* Fisher Decl. Ex. 119 (Final Design Report), Dkt. No. 198-144, at 20.  However, this reference does not help the Town in the way it supposes, as "in the vicinity" suggests that not every compound identified in the appendix was actually found on the Hooker-Ruco Site itself.  Aside from evidence showing that on one occasion Occidental ordered Freon-113 in connection with the Site and that Freon-113 was found to exist somewhere on land in the vicinity of the Site, Hempstead's claim that Freon-113 was used at the Hooker-Ruco Site essentially rests on speculation contravened by compelling evidence offered by Occidental that Freon-113 was never used in any of the processes conducted at the Site.

Although the Court does not believe that the evidence proffered by the Town creates a disputed fact on whether Freon-113 existed at the Hooker-Ruco Site, assuming for purposes of argument that it does, it does not advance the Town's cause on Occidental's and the Covestro defendants' motions for summary judgment.  Indeed, any dispute on this point is immaterial.  As discussed above, even assuming the presence of Freon-113 contamination at the Hooker-Ruco

Site, the Town offers no explanation for:  (1) how the Freon-113 traveled to the Town's wells without the predominant contaminant of concern in the Hooker-Ruco sub-plume; and (2) how Freon-113 could have migrated from the Hooker-Ruco Site to the Town's Wells given the rate at which groundwater travels and the distance and time involved.  Thus, Occidental's and the Covestro defendants' motions for summary judgment must be, and are, granted.

Equally fatal as the failure to establish causation, and an alternative basis for the Court's entry of summary judgment for defendants, Hempstead's CERCLA claims fail to pass muster under the National Contingency Plan (the "NCP").  As explained in *Town of Oyster Bay v. Northrup Grumman Systems Corporation*, a private party plaintiff must establish that its response costs were both "necessary" and incurred consistent with the NCP to sustain a CERCLA § 107 claim.  No. 05-cv-1945, 2009 WL 10691086, at *19, 23–24 (E.D.N.Y. May 14, 2009) (citing 42 U.S.C. § 9607(a)(4)(B)) (granting summary judgment on CERCLA claims because the plaintiff town, just like Hempstead here, did not follow the NCP); *see* also *B.F. Goodrich Co.*, 952 F.2d at 1198.  A "private party response action will be considered consistent with the NCP if the action, when evaluated as a whole, is in substantial compliance with the applicable requirements" of the NCP.  40 C.F.R. § 300.700(c)(3)(i).  This is so while recognizing that "[i]mmaterial or insubstantial deviations" from the NCP do not render a response action inconsistent with the NCP.  40 C.F.R. § 300.700(c)(4).

Where the presence of contamination is acknowledged and response action is taken, a first step adjudication is required to determine whether the response action was a removal action or a remedial action.  "Removal actions are clean-up or removal measures taken to respond to immediate threats to public health and safety," whereas "[r]emedial actions are generally actions designed to permanently remediate hazardous waste."  *New York v. Next Millenium Realty, LLC*,

SPA-20

732 F.3d 117, 124–25 (2d Cir. 2013) (citing 42 U.S.C. §§ 9601(24)–(25)).  The distinction can be dispositive since the NCP requirements for remedial actions are more stringent than those for removal actions.  *See Carson Harbor Village, Ltd. v. Unocal Corp.*, 287 F. Supp. 2d 1118, 1155 (C.D. Cal. 2003) ("Because of the exigency inherent in removal actions, the statutory requirements for NCP compliance relative to such actions are somewhat more relaxed."); *Public Service Co. of Colo. v. Gates Rubber Co.*, 175 F.3d 1177, 1183 (10th Cir. 1999).  But a ruling on whether Hempstead's response is a removal or remedial action is unnecessary, as it cannot even create a material dispute of fact to disprove defendants' showing that the response actions the Town took do not substantially comply with the more relaxed standards for NCP compliance for removal actions.

*First*, the Town did not provide sufficient opportunity for public comment, which "must be provided regardless of whether a removal or remedial action is performed."  *VME Americas, Inc. v. Hein-Werner Corp.*, 946 F. Supp. 683, 690 (E.D. Wi. 1996) (granting summary judgment where plaintiff seeking reimbursement for costs incurred did not comply with public notice and comment requirements of the NCP).[9]  As a general matter, the NCP states that "[p]rivate parties undertaking response actions should provide an opportunity for public comment concerning the selection of the response action."  40 C.F.R. § 300.700(c)(6).  With regard specifically to "community relations in removal actions," the NCP provides that the Town "shall inform the

---

[9] In opposition, plaintiff cites *Versatile Metals, Inc. v. Union Corp.*, 693 F. Supp. 1563, 1577 (E.D. Pa. 1988) and *Carlyle Piermont Corp. v. Federal Paper Bd. Co.*, 742 F. Supp. 814, 818 (S.D.N.Y. 1990) for the propositions that "[r]emoval actions are not subject to the lengthy procedural requirements of the NCP" and the "requirements for a removal action do not include provisions for appropriate comment."  *See* Pl. Occ. Opp. at 45.  However, both *Versatile Metals* and *Carlyle* evaluated recovery actions that pre-dated the substantial revision to the NCP that took effect on April 9, 1990.  Not only are the two versions of the NCP accompanied by different compliance standards, *see VME America*, 946 F. Supp. at 689, but the new version, unlike the older version, requires Town's seeking to recover for removal actions to comply with the NCP, including its public participation requirements.  *Compare* 40 C.F.R. § 300.415(n)(1), *with* 40 C.F.R. § 300.65.

community of actions taken, respond to inquiries, and provide information concerning the release." 40 C.F.R. § 300.415(n)(1); 40 C.F.R. § 300.700(c)(5)(vi). Here, the Town admitted that it did not provide the public with any notice or opportunity to comment on the proposed treatment system prior to the selection of its remedy and the commencement of construction on one of the treatment systems, *see* Northrop 56.1 Stmt. ¶¶ 44, 139–142, which is fatal to its claim. *See VME Americas*, 946 F. Supp. at 690. Nor does the Town's July 2015 "letter to the LWD community about the proposed well site improvements," Pl. Occ. Opp. at 57–58, bring it into substantial compliance with the NCP, as the letter was sent *after* the Town had begun construction on its treatment plan for LWD Well 13 and *after* it approved design reports for the other wells.[10]

Furthermore, the Town's motion papers are barren of any evidence to create even the slightest doubt that it ignored its obligations under the NCP by not studying the cost-effectiveness of its plan and incurring unnecessary expenses in its implementation. To begin with, there is no evidence that the Town engaged in a remedial investigation/feasibility study ("RI/FS") required for remedial actions, or even the less formal Engineering Evaluation/Cost Analysis ("EE/CA") required for long-term removal actions. *See* 40 C.F.R. § 300.415(b)(4) ("Whenever a planning period of at least six months exists before on-site activities must be initiated, and the lead agency determines, based on a site evaluation, that a removal action is appropriate: (i) The lead agency shall conduct an engineering evaluation/cost analysis (EE/CA) or its equivalent."). An EE/CA considers the nature and extent of site contamination and any threats to human health or the environment, as well as analyzes the effectiveness, implementability, and cost alternatives that may satisfy the objectives of the removal action prior to recommending a course of action. *See*

---

[10] Tellingly, the July 2015 letter did not even reference the work commenced on LWD Well 13, *see* Fisher Decl. Ex. 22 (July 2015 Letter), Dkt. No. 171-22, so plaintiff's argument that the letter satisfied the public participation requirement of the NCP fails on its face.

SPA-22

Miller Decl. Ex. 10 (Herman Expert Report), Dkt. No. 179-11, at 23. The Town's hired engineer prepared design reports, but those reports did not include a risk evaluation, alternatives analysis, or any other of the hallmarks of an EE/CA to ensure that a chosen remedy is cost effective.

Compounding its mistake in not performing a pre-implementation cost analysis, the record reveals that Hempstead incurred unnecessary expenses by overdesigning its remedy even though CERCLA only allows a plaintiff to recover the "necessary costs of response . . . consistent with the national contingency plan." 42 U.S.C. § 9607(a)(1–4)(B). For example, D&B designed the treatment systems to treat 420 μg/l of TCE even though no TCE had been found in the LWD Wells. *See* Northrup Rule 56.1 Stmt. ¶¶ 70–71, 103. No Town representative or expert has been able to explain why it chose this aggressive threshold, and Northrup's treatment design expert determined that the 420 μg/l design criteria led to unnecessary costs, *id.* ¶ 136, all of which is uncontroverted. Thus, the costs are unrecoverable as a matter of law because they were incurred merely to respond to a "theoretical threat," *Regional Airport Authority of Louisville v. LFG, LLC*, 460 F.3d 697, 705–06 (6th Cir. 2006), and used for a design that was "unnecessary to address the hazardous substances at issue." *Waste Management of Alameda County, Inc. v. East Bay Regional Park District*, 135 F. Supp. 2d 1071, 1099 (N.D. Cal. 2001); *see also Town of Oyster Bay*, 2009 WL 10691086, at *21–22.[11]

The Town's shortcomings in its purported compliance with the statutory requirements for NCP-qualified removal actions are laid bare by its admitted failure to understand those requirements beforehand. Straightforwardly, Hempstead's witnesses, including the Commissioner

---

[11] Hempstead also admitted that it installed the PTAS on LWD Well 7A/8A in two treatment towers due to "aesthetic" considerations unrelated to any "health based reason or regulatory reasons," Northrup Rule 56.1 Stmt. ¶¶ 117–118, even though it would have been less expensive and equally effective to use one tower. *Id.* ¶¶ 120–122. But there is "no support for any theory basing CERCLA liability on aesthetics: the concern of CERCLA is to correct a hazardous situation, not an aesthetic blight." *Milbut v. Hi-Score Plant Food Co.*, No. 91-2008, 1992 WL 396774, at *5 n.5 (E.D. Pa. Dec. 24, 1992).

of the Water Department and the engineer who designed the treatment systems, testified that they were not aware of the NCP when planning the treatment. *See* Northrop Rule 56.1 Stmt. ¶¶ 128, 131. Likewise, no one in the Town bore responsibility for ensuring that the Town complied with the NCP in connection with its treatment. *Id.* ¶ 129. The Town thus cannot show that it substantially complied with the NCP where it was unaware of the NCP's requirements, failed to engage the public's participation, and did not perform an analysis to ensure cost effectiveness. With these gaps in the Town's understanding of CERCLA compliance requirements, it is not surprising that there are no material facts in dispute.

In a tacit acknowledgement that it did not substantially comply with the letter of the NCP, the Town suggests a handful of reasons why it should be exempted from compliance. Each fails to persuade. *First*, plaintiff boldly requests a categorical exemption from NCP compliance for cleanups of drinking wells, arguing that "the requirements of the NCP do not squarely fit" cases that "involve[] the protection of the drinking water provided to the public and not the remediation of a hazardous waste site." Pl. Occ. Opp. at 41. The Town does not point to any such exemption in the NCP, nor could it: courts routinely review NCP compliance in CERCLA cases involving public water suppliers. *See, e.g.*, *Town of Halfmoon v. General Elec. Co.*, 105 F. Supp. 3d 202 (N.D.N.Y. 2015); *S. Farmingdale Water Dist. v. Coltec Indus. Inc.*, No. 05-cv-1566, 2007 WL 9718900 (E.D.N.Y. Oct. 17, 2007).

Nor do the Town's discussions with the Nassau County Department of Health ("NCDOH") remove it from the strictures of the NCP. While a private party may establish compliance with the NCP by showing that its response was conducted under the monitoring, and with the ultimate approval, of a state's environmental agency, *see Niagara Mohawk Power Corp.*, 596 F.3d at 137, DEC did not monitor or approve the Town's plans. The Town claims that "the NYSDOH and

NCDOH, with input from []DEC, had oversight and approval of the design and implementation of the wellhead treatment systems," Pl. Occ. Opp. at 57, but the record paints a different picture. The only evidence of DEC's involvement that the Town points to is that DEC provided the Town with certain documents upon request in November 2013, and the Town later provided DEC with its treatment design reports in August 2014. *See* Merklin Decl., Dkt. No. 193 ¶¶ 29, 52. Notably absent is any evidence that the Town discussed its proposed wellhead treatment system with DEC, let alone that DEC provided input, evaluated, discussed, or approved the proposal. These circumstances are a far cry from the "monitoring" and "ultimate approval" by DEC that would obviate the need for NCP compliance. *See Innis Arden Golf Club*, 629 F. Supp. 2d at 181 n.3 (granting summary judgment because, *inter alia*, a "remediation project" that "proceeded with minimal state involvement other than periodic updates" did not satisfy the NCP compliance obligation).

Finally, assuming without deciding that there is merit in the Town's argument that its compliance with the PWSCP would satisfy its requirements under the NCP, *see* Pl. Occ. Opp. at 47–55, it fails to shield Hempstead from the grant of summary judgment to defendants on their motions. Simply put, even if the argument is valid, the supporting facts are missing since Hempstead is unable to show that its actions conformed with the PWSCP. At the outset, the Town's Water Commissioner testified that he could not identify any steps in the PWSCP that the Town complied with. *See* Northrup Rule 56.1 Stmt. ¶ 23. Further, the PWSCP provides that "once the trigger value(s) has been reached and confirmed," "pre-design discussions/negotiations will commence between NAVY/Northrop Grumman and the potentially affected water district(s) so that funding for wellhead treatment or comparable alternative measure can be negotiated and provided to the water district(s)." PWSCP at 11. But the record shows that no pre-design

24

**SPA-25**

discussions and negotiations took place, nor was a financial agreement in place prior to the Town beginning its work. After Northrup's consultant informed the Town of the trigger value exceedances on July 12, 2012, the Town did not commence negotiations with Northrup or the federal defendants. Northrup Rule 56.1 Stmt. ¶¶ 30–32, 39. Rather, the Town opted to design and begin construction on its treatment systems, making no contact with the federal defendants or Northrup until three years later, when it requested post-design, post-construction funding. *Id.* ¶ 39. Contrary to the Town's suggestions, *see* Pl. Fed. Opp. at 56, there is nothing in the PWSCP to suggest that it was the federal defendants' or Northrup's burden to initiate negotiations or that the Town's compliance was optional. These last-ditch defenses, in sum, do not save the Town from judgment.[12]

Defendants, as one might imagine, seek to leverage the facts found undisputed in defeating Hempstead's CERCLA claims to similarly defeat its claims interposed under New York common law. Northrup argues that each of the Town's common law claims is fatally hobbled by the finding already made that plaintiff has not raised a genuine issue of material fact regarding the source of the Freon-113 in LWD Wells 7A, 8A, or 13, nullifying Hempstead's ability to prove an element essential to all of those claims, namely that chemical constituents leaving either the NWIRP Site or Hooker-Ruco Site contaminated the LWD Wells. *See* Northrup Mot. at 36–38.[13] In opposition, the Town argued the only issues properly before the Court are issues related to the Town's Phase I CERCLA claims, at least as scheduled for briefing.

---

[12] The Town also asserts a claim for declaratory judgment under Section 113(g)(2), 42 U.S.C. § 9613(g)(2) against all defendants. Because the Town has not demonstrated a valid claim under Section 107 against any defendant, defendants are also entitled to a judgment as a matter of law on the declaratory relief claim. *See Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 92 (2d Cir. 2000); *Town of Oyster Bay*, 2009 WL 10691086, at *24.

[13] Occidental, by contrast, argues that in the absence of viable CERCLA claims, the Court lacks jurisdiction under CERCLA § 113(h) over the common law claims. *See* Occidental Mot. 33–34. Because the Court dismisses the common law claims for the reasons outlined in Northrup's motion, the Court need not address Occidental's jurisdictional argument.

SPA-26

Although, as the Town correctly notes, the Phase II claims are not formally presented for consideration on these motions, the rules of procedure do not demand that form be the enemy of substance. It is true, as defendants say, that after discovery and full litigation of the common essential issue on these motions, the Town was unable to even raise a genuine disputed material fact about, much less prove causation, by connecting the Freon-113 in the LWD Wells to either the NWIRP Site or Hooker-Ruco Site. A showing of causation is, plainly, required to make out each of the common law claims advanced by the Town. *See, e.g.*, *Suffolk Cnty. Water Auth. v. Dow Chem. Co.*, 958 N.Y.S.2d 649 (N.Y. Sup. Ct. 2010) (to make out the common law claims, like, for example, public nuisance, a plaintiff must demonstrate that there was an unreasonable interference with the rights of the public, intentionally caused by the defendant's conduct); *Fetter v. DeCamp*, 195 A.D.2d 771, 773–74 (N.Y. App. Div. 3d Dep't 1993) (granting summary judgment for the defendant in a case involving negligence for pollution of underground waters where the plaintiff did not provide evidence establishing contamination of the well or its source). Upon a search of the record in this case, the Town's failures on its CERCLA claims forecloses it from making the required showing of causation. In this posture, judicial economy will best be served by dismissing these claims now. *See ABB Indus. Sys., Inc. v. Prime Tech., Inc.*, 120 F.3d 351, 360 (2d Cir. 1997) (holding that, because plaintiff could not establish that the defendants contaminated the site in its CERCLA action, its negligence claims were also properly dismissed). Accordingly, defendants are entitled to and are awarded judgment on Hempstead's claims brought under New York common law.

<u>Conclusion</u>

For the foregoing reasons, defendants' motions for summary judgment are granted in full. The Clerk of Court is directed to enter judgment accordingly and to close this case.

SPA-27

So Ordered.

Dated: Brooklyn, New York
February 16, 2025

/s/ Eric N. Vitaliano
ERIC N. VITALIANO
United States District Judge

SPA-28

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
TOWN OF HEMPSTEAD,

                                JUDGMENT

              Plaintiff,
        v.
                                16-CV-3652 (ENV) (ST)

UNITED STATES OF AMERICA, et al.,

              Defendant.
-------------------------------------------------------------X

A Memorandum and Order of the Honorable Eric N. Vitaliano, United States District Judge, having been filed on February 16, 2025, granting defendants' motions for summary judgment in full; it is

ORDERED and ADJUDGED that defendants' motions for summary judgment are granted in full.

Dated: Brooklyn, New York
       February 26, 2025

                                Brenna B. Mahoney
                                Clerk of Court

                        By:     /s/Jalitza Poveda
                                Deputy Clerk